# THE OREGON.[1]

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

Nos. 270, 273. Argued April 8, 9, 1895. — Decided May 6, 1895.

A steamer steaming in a dark night at the rate of fifteen miles an hour through a narrow inland channel where a local pilot is put in charge of it, should have a lookout stationed on either bow, and the master should be on deck; but a failure to comply with these requirements will not, in

---

[1] The Docket titles of these cases are: "No. 270, *John Simpson* v. *The Steamer Oregon, her tackle &c., the Oregon Short Line and Utah Northern Railway Company* :" No. 273, "*The Oregon Short Line and Utah Northern Railway Company* v. *The Ship Clan Mackenzie, John Simpson, Claimant, et al.*"

Statement of the Case.

·case of collision, suffice to condemn the steamer, unless there be proof that the failure contributed to the collision.

From the facts as stated by the court in the statement of facts and in the opinion, it is held that there can be no doubt that the collision between the Oregon and the Clan Mackenzie was attributable to the inefficiency of the pilot and lookout of the Oregon.

Where one vessel, clearly shown to have been guilty of a fault adequate in itself to account for a collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributing fault, and this principle is peculiarly applicable to a vessel at anchor, complying with regulations concerning lights and receiving injuries through the fault of a steamer in motion.

The provision in Rev. Stat. § 4234 that every sail vessel shall on the approach of a steam vessel during the night time, show a lighted torch upon that point or quarter to which the steam vessel shall be approaching, is no part of the International Code, and would seem to apply only to American vessels, and has no application to vessels at anchor.

Under all ordinary circumstances a vessel discharges her full duty and obligation to another vessel by a faithful and literal observance of the International rules.

The obligors in a stipulation given for the release of a vessel libelled for a collision are not, in the absence of an express agreement to that effect, responsible to intervenors in the suit, intervening after its release; but the court below may treat their petitions as intervening libels, and issue process thereon, or take such other proceedings as justice may require.

THIS suit was originally instituted December 31, 1889, by the filing of a libel in admiralty by John Simpson, master of the British ship Clan Mackenzie against the steamer Oregon, to recover damages for a collision between the two vessels, which occurred December 27th in the Columbia River about a mile above a point in the river known as Coffin Rock light, and resulted in the sinking of the Clan Mackenzie, and the loss of two of her crew. The libel charged the Oregon with fault in not having a proper lookout or a competent pilot, and in failing to keep out of the way of the Clan Mackenzie, which was then at anchor.

Upon the Oregon being arrested, a claim to her was interposed by the Oregon Short Line and Utah Northern Railway Company, and a stipulation given in the sum of $260,000 to answer the libel. Subsequently, intervening petitions were filed by James Laidlaw, administrator of the estates of the

two seamen of the ship who were killed in the collision, by John Simpson and his wife individually, and by eighteen others of the crew of the Clan Mackenzie for the loss of their property, clothing, and effects in the sinking of the ship. Copies of these petitions were served upon the claimant, but no warrant of arrest was issued, and no separate stipulation was given to answer the intervenors' demands.

James Joseph, another of the crew, also intervened, alleging that he had been seriously injured by the collision, and asking damages therefor. Exceptions to these petitions were filed, denying the right to intervene after the vessel had been discharged from arrest. These exceptions were overruled, and the claimant ordered to answer. Answers were accordingly filed.

Subsequently, and on April 5, 1890, the Oregon Short Line and Utah Northern Railway Company, charterer of the Oregon, filed a cross-libel against the Clan Mackenzie, charging that the collision occurred through the fault of the latter, in failing to display a proper anchor light, to keep a proper anchor watch, or to call the steamer's attention by shouting, ringing the ship's bell, or showing a lantern or torch, as required by Rev. Stat. § 4234. A stipulation was given in the sum of $50,000 to answer this cross-libel, and the cases came on to a hearing in the District Court upon libel and cross-libel.

The District Court found the Oregon to have been in fault for excessive speed, for want of a proper lookout, and of an officer on deck, and for the negligence of her pilot in mistaking the anchor light of the Clan Mackenzie for that of Coffin Rock, and for not keeping farther out in the channel of the river. The District Court also found the Clan Mackenzie to have been in fault for the want of a proper lookout, for failure to ring her bell, and for the omission to exhibit a torch. The case was adjudged to be one of mutual fault, and a decree was entered dividing the damages. The intervening petitions were held to have been properly filed, and one-half of their claims was ordered to be paid by the Oregon, and the other half out of the money found to be due to the Clan Mackenzie. 45 Fed. Rep. 62. From this decree both parties appealed to

Statement of the Case.

the Circuit Court, which affirmed the decree of the District Court, and made the finding of facts printed in the margin.[1]

---

[1] FINDING OF FACTS.

First. That the Clan Mackenzie is a British vessel of twenty-five hundred tons burden, built of iron, two hundred and fifty-nine feet in length, thirty-eight feet beam, and twenty-three feet in the hold, and was early in the forenoon of December twenty-sixth, eighteen hundred and eighty-nine, at Astoria, Oregon, bound for Portland from Rio Janeiro, in ballast, and in tow of the steamboat Ocklahama, of which one Henry Empkins was master and pilot.

Second. That about eight o'clock in the evening of said day said vessel came to anchor on the Oregon side of the Columbia River in five fathoms of water, at three feet flood tide and about nine hundred feet distant from and a little below a dock and woodyard for steamboats called Neer City; also, about three-fourths of a mile below Goble's Point and a mile above Coffin Rock.

Third. That immediately below said Coffin Rock and a short distance inside of it, on the face of a wooded promontory and at a height of about thirty feet from the water, there is and was at said time maintained a government light, described as a tubular-lens lantern of one hundred candle power, with a radiating power of four miles, and easily visible on a dark, clear night from three to four miles.

Fourth. That said steamboat Ocklahama was owned at said date by the Oregon Railway and Navigation Company, but was in possession and control of said Oregon Short Line and Utah Northern Railway Company under a lease from said Oregon Railway and Navigation Company, and that said Henry Empkins, as master and pilot, was the agent of the said Oregon Short Line and Utah Northern Railway Company.

Fifth. That said pilot anchored the Clan Mackenzie on the edge of the ship channel, which at that point is nearly half a mile wide at the mean of the lowest low waters and well out of the usual track of the ocean steamers that ply between Portland and San Francisco, and also back and out of the range of said Coffin Rock light.

Sixth. That under the direction of said pilot there was placed in the fore rigging of said Clan Mackenzie on the starboard side midway between the foremast and the shrouds, between twenty and twenty-five feet above the deck and thirty-five to forty feet above the water, an anchor light, which was a white light in a copper lantern with a globular corrugated lens over eight inches in diameter, and that the material used in it was equal to the best coal oil, and it would burn eight hours without trimming; that it was easily visible on a dark, clear night a mile away and was kept in place and burning brightly from ten o'clock P.M. of said December twenty-sixth up to and at the moment of the collision hereinafter mentioned.

Seventh. That said pilot then proceeded with said Ocklahama to the dock of the woodyard at said Neer City, where said steamboat was tied up for the night.

*Mr. C. E. S. Wood* for Simpson and the Clan Mackenzie.

*Mr. Artemas H. Holmes* for the Oregon and the Railway Company. *Mr. W. W. Cotton*, *Mr. John F. Dillon*, and *Mr. J. M. Wilson* were with him on his brief.

---

Eighth. That said Clan Mackenzie was well and properly anchored, and that the light hung in the rigging thereof was properly hung and was in all respects a good and sufficient anchor light.

Ninth. That about nine o'clock in the evening of said December twenty-sixth, eighteen hundred and eighty-nine, the Oregon, an iron steamship of about one thousand tons burden and three hundred feet in length, and being operated by said Oregon Short Line and Utah Northern Railway Company under the lease from the Oregon Railway and Navigation Company as owner thereof, left Portland, Oregon, for San Francisco, California, with a cargo of freight and passengers, under the charge of a pilot, and drawing between sixteen and seventeen feet of water and having a proper mast light and side lights burning.

Tenth. That the night of said December twenty-sixth, eighteen hundred and eighty-nine, was dark and clear, the weather calm, with some clouds in the sky; a few stars were visible, and according to the calendar the moon set at 9.42 P.M.

Eleventh. That during the passage of the Oregon down the Columbia River, and up to the time of the collision, the pilot thereof was on the centre of the bridge just abaft and above the pilot-house, and there was a man at the wheel and another forward on the forecastle head acting as a lookout. The steersman and lookout came on duty at twelve o'clock, and besides these no person connected with the vessel was on duty on deck from that time to the collision.

Twelfth. That near one o'clock, and a mile or more above Goble's Point and opposite the railway ferry landing, the anchor light of the Clan Mackenzie and the Coffin Rock light might both have been seen from the ship's channel in the Columbia River, and there the pilot of the Oregon saw one light which he took for said Coffin Rock light.

Thirteenth. That from this point the Oregon followed the bend of the river to the westward for nearly a half mile until both lights were shut out by Goble's Point, and in the course of the next half mile she came back to the northward, so that by the time she was abreast of the foot of Sand Island and just above Goble's Point, if she had been in midchannel, both lights would have been plainly visible from her deck, though somewhat in line, the light of the Clan Mackenzie being the farther in shore; but the Oregon, instead of being in midchannel, hugged the shore in the bend above Goble's Point, and came abreast of said point on the south side of the channel, when the pilot saw a light, which he supposed to be Coffin Rock light, and headed for it, giving the steersman the course northwest by north, which was held to the moment of the collision, while the general

Counsel for Intervenors.

*Mr. William A. Maury* by leave filed a brief for intervenors. *Mr. Raleigh Stott, Mr. W. L. Boise, Mr. George C. Stout,* and *Mr. C. W. Fulton* were with him on the brief.

---

direction of the ship channel from abreast of said Goble's Point to below Coffin Rock light is north-northwest.

Fourteenth. That the light which the pilot saw both above, at, and below Goble's Point and which he mistook for the Coffin Rock light, was in fact the anchor light of the Clan Mackenzie, but that the Coffin Rock light was burning brightly during all said times, and should have been visible from the deck of the Oregon.

Fifteenth. That during said time, and up to the moment of the collision, the Oregon was going through the water at the rate of twelve miles an hour and about fifteen miles past the land.

Sixteenth. That the Oregon arrived within three hundred feet of the Clan Mackenzie when the pilot and lookout of the Oregon simultaneously discovered the Clan Mackenzie, and the helm of the Oregon was immediately put to port.

Seventeenth. That the course of the Oregon was not changed in time to avoid a collision, and she struck the Clan Mackenzie in a direction slightly diagonal to her keel between the port cathead and the stem, and cut into her for a distance of about thirty feet.

Eighteenth. That from the deck of the Oregon the outline of the shore from Goble's Point to Coffin Rock was easily distinguishable, and the light of the Clan Mackenzie should have been seen and distinguished for at least a quarter of a mile.

Nineteenth. That it was and is the custom of vessels being towed from Astoria to Portland to anchor for the whole or part of a night in the Columbia River, which fact should have been known to the persons in charge of the Oregon, and they should have kept a good lookout for such vessels in order to avoid a collision.

Twentieth. That said collision was caused primarily by the fault of the Oregon, in that she was being run at too high a rate of speed; that she did not have a proper lookout on the bow; that she should have had at least one officer on deck to oversee said lookout, and that her pilot was negligent or incompetent in mistaking the anchor light of the Clan Mackenzie for that of Coffin Rock light and in not keeping well out into the channel of the river before rounding Goble's Point, so as to bring the Coffin Rock light plainly in view before giving the steersman the course, and also in standing continuously at the middle of the bridge over and above the light in the pilot-house instead of moving back and forth thereon.

Twenty-first. That there was a watch on board the Clan Mackenzie, who had instructions from the master to keep a good lookout and ring the bell if the weather became thick or foggy, and that said watch saw the light of the Oregon when about three-fourths of a mile away and her hull when at a distance of about one-fourth of a mile, when he perceived that she was

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

At the time of the collision in question, which occurred about one o'clock on the morning of December 27, 1889, the ship Clan Mackenzie, an iron sailing vessel of 2500 tons burden, bound from Rio Janeiro to Portland in ballast, was lying at anchor in five fathoms of water on the westerly or Oregon side of the Columbia River, about 900 feet distant from and below a steamboat dock known as Neer City, about three-quarters of a mile below Goble's Point, and one mile above Coffin Rock. She was anchored on the edge of the ship channel, which, at that point, is nearly half a mile wide at low water, and well out of the usual track of ocean steamers plying up and down the river, and out of the range of Coffin Rock light. She was provided with an anchor watch, and was displaying the proper statutory anchor light between twenty and twenty-five feet above the deck. In this condition she was run into and sunk by the steamship Oregon. The circumstances above detailed raise a presumption of fault on the part of the Oregon, and the burden of proof is upon her to exonerate herself from

heading directly for the Clan Mackenzie and commenced shouting and continued to do so until just before the collision, but he did not ring the bell. The weather was not thick or foggy.

Twenty-second. That said Clan Mackenzie was not provided with a torchlight to be shown on the approach of danger and none was shown at the time the Oregon was approaching.

I further find from the evidence now introduced in connection with that introduced in the District Court that it is not customary when a ship is at anchor in a harbor, river, or channel, as in this case, with her anchor light burning brightly, and the night is clear and without fog, to show a torch or a flash light or ring a bell on the approach of a steamer, and that if a torch or flash light is not already prepared and at hand and ready for use that it would take five minutes to obtain one from the place where they are usually kept and light it.

Twenty-third. That said Clan Mackenzie, being a foreign vessel, was not required, under section forty-two hundred and thirty-four of the Revised Statutes, to burn a torch on the approach of the Oregon, and it was not the custom on the Columbia River to do so or to ring a bell in a clear night under like circumstances, but the liability to a collision would have been greatly diminished had either been done in time.

liability. *The Clarita and The Clara*, 23 Wall. 1, 13; *The Virginia Ehrman and The Agnese*, 97 U. S. 309, 315; 1 Parsons on Shipping, 573. Has she succeeded in doing so? An answer to this question requires the consideration, both of her own movements, and of the alleged delinquencies on the part of the Clan Mackenzie.

1. The Oregon was an iron steamship, 300 feet in length, and of about 1000 tons burden, and was navigated by the railway under a charter from her owner, the Oregon Railway and Navigation Company, in a freight and passenger trade between Portland and San Francisco. She left Portland at about nine o'clock in the evening in question with a cargo of freight and passengers, under charge of a river pilot, drawing about sixteen feet of water, and displaying her proper riding lights. The weather was calm and the sky somewhat cloudy, but the night was dark and clear — such a night as is most favorable to the discovery of lights. The deck watch was composed of the river pilot in command, who was on the bridge just above the pilot-house; a man at the wheel, and a lookout upon the forecastle head. No officer and no other man connected with the vessel was on deck from the time the watch was changed at 12 o'clock until the collision.

Considering the darkness of the night, her rate of speed, which was fifteen miles an hour past the land, the narrowness of the channel, and the probability of meeting other vessels, the greatest watchfulness was required, and we think that prudence demanded at least an additional lookout. The watch was the smallest that would be tolerated under any circumstances, and even were it sufficient for navigation by daylight, it by no means follows that it was sufficient for running a river in a dark night. It is hardly possible that, in a four-hour watch, the attention of the lookout should not be occasionally diverted from his immediate duty. Yet the withdrawal of his eye from the course of the vessel even for the fraction of a minute may occur at a moment when a light comes in sight, and before this light can be accurately located and provided for, a collision may take place. As was said by Mr. Justice Swayne in *The Ariadne*, 13 Wall. 475, 478:

" The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of the vessel with all the property, and the lives of all on board. The same consequences may result to the vessel with which his shall collide. In the performance of his duty the law requires indefatigable care and sleepless vigilance."

Where, as in this case, the circumstances are such as to require more than ordinary care, we think it not too much to require a lookout to be stationed on either bow. It was said in the case of *The Ogdensburg* (*Chamberlain* v. *Ward*), 21 How. 548, 571, that ocean steamers usually have two lookouts in addition to the officer of the deck, and that no less precaution should be taken by first-class steamers on the Lakes. In the case of *The Germania*, 3 Mar. Law Cases (O. S.), 269, a case of a steamer which had come into collision with a barque in the English Channel in a dark night, the Privy Council were advised by the nautical assessors, who assisted them, that it was the usual practice in king's ships to have never less than two lookouts at the bowsprit, and their lordships announced themselves as not satisfied with the sufficiency of the reason alleged for having only one lookout in that case. While, in the case of *The Colorado*, 91 U. S. 692, the collision took place during a dense fog, it was said, in the opinion of the court, that a watch consisting only of the mate, one wheelsman, and one lookout, besides the engineer, would hardly be considered sufficient for a large propeller, even in a clear night.

Nor are we satisfied with the conduct of the master in leaving the pilot in sole charge of the vessel. While the pilot doubtless supersedes the master for the time being in the command and navigation of the ship, and his orders must be obeyed in all matters connected with her navigation, the master is not wholly absolved from his duties while the pilot is on board, and may advise with him, and even displace him in case he is intoxicated or manifestly incompetent. He is still in command of the vessel, except so far as her navigation is concerned, and bound to see that there is a sufficient watch on

deck, and that the men are attentive to their duties. *The Iona*, L. R. 1 P. C. 426.

In *The Batavier*, 1 Spinks, 378, 383, it was said by Dr. Lushington : "There are many cases in which I should hold that, notwithstanding the pilot has charge, it is the duty of the master to prevent accident, and not to abandon the vessel entirely to the pilot; but that there are certain duties he has to discharge (notwithstanding there is a pilot on board) for the benefit of the owners." In an official report made by a maritime commission in 1874, the Elder Brethren of Trinity House are said to have expressed the opinion "that in well-conducted ships the master does not regard the presence of a duly licensed pilot in compulsory pilot waters as freeing him from every obligation to attend to the safety of the vessel; but that, while the master sees that his officers and crew duly attend to the pilot's orders, he himself is bound to keep a vigilant eye on the navigation of the vessel, and, when exceptional circumstances exist, not only to urge upon the pilot to use every precaution, but to insist upon such being taken." Marsden on Collisions.

These deficiencies in the watch, however, are rather evidences of negligence, and illustrative of lax management in the navigation of the vessel than distinct faults in themselves, and would not suffice to condemn the vessel in the absence of evidence that they contributed to the collision. The question still remains, what was the particular act or omission which brought about the collision?

At Goble's Point, three-quarters of a mile above where the Clan Mackenzie lay, there is a bend in the channel; but the anchor light of the ship, as well as Coffin Rock light, might have been seen from the deck of the Oregon near the railway ferry landing, a mile or more above Goble's Point. The pilot did in fact see one of such lights, which he took to be Coffin Rock light. As the steamer neared Goble's Point, however, both lights were shut in by the land; but a little before reaching the point, if she had been in midchannel, both lights would have been plainly visible from her deck, though somewhat in line, that of the ship being a little nearer the bank.

But the Oregon, instead of being in midchannel, hugged the shore in the bend above Goble's Point, and was on the southerly (more properly, the westerly) side of the channel as she came abreast of the point, when the pilot saw a light, which he supposed to be Coffin Rock light, and headed for it, giving the wheelsman the course N. W. by N., which was held to the moment of the collision, although the general direction of the ship channel from a point abreast of Goble's Point is N. N. W. (This finding is probably a mistake for N. W. by N. ½ N.) The light which the pilot saw both above, at, and below Goble's Point, and which he mistook for the Coffin Rock light, was in fact the light of the Clan Mackenzie. But the Coffin Rock light was burning brightly all this time, and should have been visible from the deck of the Oregon.

The pilot did not in fact discover the Clan Mackenzie until he was within 300 feet of her, when he and the lookout simultaneously made her out, and the wheel was immediately put to port. The change of course, however, was too late to avoid a collision, and the steamer struck the Clan Mackenzie in a direction slightly diagonal to her keel, between the port cathead and the stem, and cut into her a distance of about thirty feet. It is stated by the District Judge that the pilot sought to excuse himself for seeing but one light, by suggesting that the two lights must have been so near in line that a mast of the Clan Mackenzie intercepted the rays of the Coffin Rock light. But, as the outline of the shore from Goble's Point to Coffin Rock was easily distinguishable from the deck of the Oregon, it was manifestly owing to the negligence or inefficiency of the lookout, that the two lights were not separated and distinguished, as the Oregon rounded Goble's Point. Indeed, the finding of the Circuit Court is that both lights might have been seen at the railway ferry landing, a mile above Goble's Point, and from the course of the river at and below the landing, it is impossible that the two lights should not have been distinguished before the steamer reached the point; and, even after that, they could hardly have been so constantly in line as not to be separated, if the lookout had been attentive to his duty. In all probability, however, he

was watching the Coffin Rock light, and gave no thought to the possibility of there being another light between him and Coffin Rock. From the fact that the Clan Mackenzie was anchored on the westerly edge of the channel, and that as soon as she was perceived, the order was given to port, it would appear that the Oregon was considerably to the westward of her proper course, and that, instead of shaping her course outside of Coffin Rock light, she was in reality heading directly for the light of the Clan Mackenzie, which she mistook for the other. The pilot should not have been taken unawares by the presence of the ship, as there is a distinct finding that it was the custom of vessels being towed from Astoria to Portland to anchor for the whole or part of the night in the Columbia River, and that this fact should have been known to the persons in charge of the Oregon, and they should have kept a good lookout for such vessels. Add to this the further fact that the lookout of the Clan Mackenzie repeatedly hailed the steamer, while she was yet a quarter of a mile away, and that the Oregon neither distinguished her light nor heard her hail, and the inattention or incompetency of the lookout becomes even more clearly manifest. In short, there can be no doubt whatever that this collision was attributable to the inefficiency of the pilot and lookout of the Oregon.

2. The District Judge was also of opinion that the Clan Mackenzie failed to discharge her whole obligation to the steamer, and should consequently share the loss. In this opinion the Circuit Judge, with evident hesitation, concurred. As we had occasion to remark in *The City of New York*, 147 U. S. 72, 85, where one vessel clearly shown to have been guilty of a fault, adequate in itself to account for the collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributing fault. This principle is peculiarly applicable to the case of a vessel at anchor, since there is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the other vessel, which shifts the burden of proof upon the latter.

So far as concerns the management of the Clan Mackenzie, the facts found are that her anchor watch was charged by the master to keep a good lookout, and ring the bell if the weather became thick or foggy; that the watchman saw the light of the Oregon about three-quarters of a mile away, and her hull when at a distance of about one-quarter of a mile, when he perceived that she was heading directly for the Clan Mackenzie, and commenced shouting, and continued to do so until just before the collision, but did not ring the bell; that the Clan Mackenzie was not provided with a torchlight, to be shown on the approach of danger, and none was shown at the time the Oregon was approaching.

Upon these facts the Clan Mackenzie was found to have been in fault, first, in not providing her anchor watch with a torchlight or flare-up, whereby her presence might have been indicated to the approaching steamer; and, second, because her anchor watch did not avail himself of the means at hand for this purpose, to wit, the ship's bell. The International Code, (Rev. Stat. § 4233,) in force at this time, provided, (rule ten,) that "all vessels, whether steam-vessels or sail-vessels, when at anchor in roadsteads or fairways, shall, between sunset and sunrise, exhibit, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a globular lantern of eight inches in diameter, and so constructed as to show a clear, uniform, and unbroken light, visible all round the horizon, and at a distance of at least one mile."

This rule was substantially, if not literally, complied with. The light was of the regulation size, and if it were hung a little over twenty feet above the hull, the difference was entirely immaterial, as it is found to have been seen by the pilot of the Oregon, though mistaken for the Coffin Rock light.

The obligation to exhibit a torch is claimed to arise directly from Revised Statutes, sec. 4234, which provides that "collectors, or other chief officers of the customs, shall require all sail-vessels to be furnished with proper signal lights, and every such vessel shall, on the approach of any steam-vessel

during the night-time, show a lighted torch upon that point or quarter to which such steam-vessel shall be approaching." This section was incorporated into the Revised Statutes from an act passed February 28, 1871, c. 100, 16 Stat. 440, and is strictly no part of the International Code, which was originally adopted in 1864. This act is entitled "An act to provide for the better security of life on board of vessels propelled in whole or in part by steam, and for other purposes." Its first section enacts: "That no license, register, or enrolment shall be granted, or other papers issued, by any collector or other chief officer of the customs, to any vessel propelled in whole or in part by steam, until he shall have satisfactory evidence that all the provisions of this act have been fully complied with." The act then proceeds to lay down certain requirements, designed for the protection of life upon steam vessels, and obviously intended to apply only to American vessels. The seventieth section contains the provision in question, subsequently incorporated into the Revised Statutes as § 4234. Indeed, the forty-first section of the act expressly provides that it "shall not apply to public vessels of the United States, or to vessels of other countries." Even if this section (Rev. Stat. § 4234) stood alone and unexplained by the other provisions of the act of which it was a part, it would seem to apply only to American vessels, since Congress could hardly have intended to make it the duty of collectors to require foreign sail vessels to be furnished with proper signal lights, even if it had the power to do so.

But, even admitting that § 4234 was intended to cover foreign vessels, we think it has no application to vessels at anchor, but was designed to supply an obvious deficiency in the International Code, with respect to vessels under way. By rule 8 of the original code of 1864, sailing vessels under way were required to carry colored lights visible at a distance of two miles, but so enclosed by inboard screens that they were wholly invisible to vessels coming up astern or approaching from either side, unless such approach were from a direction not more than two points abaft the beam. In other words,

one or the other of such colored lights was visible over an arc of the horizon of twenty points of the compass; but no provision was made for the exhibition of a light to a steamer coming up within the unilluminated arc of twelve points; and, in a dark night, of course there was great danger of collision, since the code provided that "no other" lights than those mentioned in its rules should be carried. Even if a steamer approached from ahead, the colored lights were frequently so dim as to escape observation, and the exhibition of a torch was a very proper additional precaution.

No such argument, however, applies to the case of vessels at anchor, which were required by rule 10 (Art. 8 of the Revised Code of 1885) to exhibit a large white light so constructed as to be visible all around the horizon, and at a distance of at least a mile. If a proper lookout be kept upon the approaching steamer, this is an adequate provision for a clear night, and the additional requirement of exhibiting a torch might impose upon the vessel anchored in a stream where steamers are constantly passing and repassing the duty of keeping a torch burning the entire night. Suppose, for instance, the vessel were anchored in New York Bay or in the lower part of the Hudson River, in ordinary weather there probably would not be a moment during the whole night when a steamer might not be said to be approaching her, within the meaning of the section, and if she were required to exhibit a torch to every such steamer, she would be required to keep one burning practically all the time. That would not only be wholly unnecessary, but liable to lead to great confusion and annoyance to passing steamers. The very fact that the section applies only to sailing vessels indicates that it refers to sailing vessels under way, since there is just as much reason for requiring a steamer to exhibit a torchlight at anchor as a sailing vessel, as the light displayed by both is the same. Indeed, it is at least open to question whether this provision, so far as it applies to the high seas, was not repealed by article 11 of the act of March 3, 1885, c. 354, 23 Stat. 438, 440, which requires that "a ship which is being overtaken by another shall show from her stern to such last-mentioned ship a white light or

flare-up light." The failure of the International Code to make some provision for notice to vessels coming up astern of another was so manifestly a *casus omissus* that, even before the adoption of the Revised Code, it was held that the leading vessel was bound to exhibit a light astern. This position was treated as a "special circumstance," requiring the use of extraordinary precautions. *The John Fenwick*, L. R. 3 Ad. & Ec. 500; *The Anglo-Indian*, 3 Asp. Mar. Law Cas. 1; *The Philotaxe*, 3 Asp. Mar. Cas. 512.

It is insisted, however, that, irrespective of the statute, the Clan Mackenzie was bound to make use of every precaution which the exigencies of the case called for, to avert a collision; that she had no right to rely upon her statutory light, but was bound either to exhibit a torch, ring a bell, or in some other equally efficient manner call the steamer's attention to the fact of her presence in the river. Undoubtedly, where the circumstances of the case are such as to demand unusual care, such care should be exercised. Indeed, there is a special provision in rule 24 that "in construing and obeying these rules due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case rendering a departure from them necessary in order to avoid immediate danger." The code, however, is supposed to make provision for all ordinary cases.

It originated in the English Merchant Shipping Act Amendment Act of 1862, the twenty-fifth section of which provided for the adoption by Order in Council of certain rules and regulations for preventing collisions at sea; requiring the adoption of certain lights, fog signals, and steering and sailing rules adapted to almost every case. These regulations were adopted *in totidem verbis* by the act of Congress of April 29, 1864, Rev. Stat. § 4233, and by all the leading maritime nations of the world; and in the case of *The Scotia*, 14 Wall. 170, were held by this court to have become the general law of the sea, and obligatory upon all nations which had given their assent to them. In the subsequent case of *The Belgenland*, 114 U. S. 355, 370, they were said to be binding upon foreign as well as domestic ships, unless the contrary were

made to appear. In 1880, a new system, not differing radically from the former one, was adopted in England; and by the act of March 3, 1885, 23 Stat. 438, c. 354, became the law in this country so far as concerned vessels navigating the high seas. The object of this code was to establish a uniform system of rules and regulations, which should be obligatory throughout the world, taking the place of the various and somewhat conflicting usages which had theretofore obtained among maritime nations. As before stated, they are regarded as sufficient protection for a vessel under ordinary circumstances; and one vessel meeting another, whether of the same or different nationality, has a right to assume that both are governed by the same laws, and each may regulate her own conduct accordingly. Exceptions to these rules, though provided for by rule 24, should be admitted with great caution, and only when imperatively required by the special circumstances of the case. It follows that, under all ordinary circumstances, a vessel discharges her full duty and obligation to another by a faithful and literal observance of these rules. The power to superadd· to them other requirements involves. the power to determine what shall be superadded, and in this. particular there is room for a great and embarrassing diversity of opinion. Thus, one court might hold that, in addition to displaying the regulation light, a vessel at anchor should swing a torch; another, that she should ring a bell; another, that she should blow a horn, beat a drum, or fire a cannon, and the result would be that a lookout would never know when he had performed his full duty to an approaching vessel. In the answer in this case it is averred that the lookout on the ship "did nothing to attract the attention of those on board said steamer, either by shouting, ringing said bell, or swinging a lantern or a torch, or otherwise; that if said lookout had shouted, or had rung said bell, or had swung a lantern or torch upon the approach of said steamer, the said night being still and dark as aforesaid, said collision would have been avoided." The proof showing, however, that the lookout did, in fact, hail the steamer, the respondent is forced to abandon this position, and claim that he should have rung his bell or swung his lantern or torch.

If courts were at liberty to add to the requirements of the statute, it would always be claimed that the signal added was not the proper signal that should have been used. Undoubtedly, if there be fog, or thick weather, a vessel at anchor is bound by rule 15 to ring a bell; but, in an ordinary clear night, with no immediate danger impending, we think a proper anchor light supplies every needful precaution. And while in *The Merchant Prince*, 10 P. D. 139, it was held that the exhibition of a flare-up light was not forbidden by article 2 of the Revised Code requiring that certain lights, and no others, should be carried; yet we are aware of no case holding that a vessel at anchor in a clear night is bound to do more than display her anchor light until danger of collision is imminent. It is true that article 24 of the Revised Code provides that nothing shall exonerate a ship from the consequences of the neglect of any precaution which may be required by the ordinary practices of seamen, or by the special circumstances of the case. But in this case there is a distinct finding that it is not customary when a ship is at anchor in a harbor, river, or channel, as in this case, with her anchor light burning brightly, and the night is clear and without fog, to show a torch or flash light, or ring a bell on the approach of a steamer. Under such circumstances the Clan Mackenzie cannot be charged with the neglect of any custom or " ordinary practice " to exhibit a torch or ring a bell.

In measuring her duty under the circumstances of this case, it must be borne in mind that her lookout had no reason whatever to apprehend danger, until the Oregon had rounded Goble's Point, and taken her course for Coffin Rock. She was then about three-quarters of a mile distant, and at her rate of speed of fifteen miles an hour, (a mile in four minutes,) would cover this distance in three minutes. Even then he had a right to assume that she would take the usual course down the centre of the channel, would see his light, and give it a proper berth. He certainly was not bound to presume that she would be guilty of the gross and almost incomprehensible negligence of turning from her proper course and running directly down upon him, and until it became manifest that she

had not observed his light, he was not called upon to act. It was then too late to light a torch, if he had had one at hand, or perhaps even to ring a bell, and in view of the finding of the Circuit Court that, if a torch or flash light is not already prepared and at hand and ready for use, it would take five minutes to obtain one from the place where they are usually kept and light it, we are unable to understand how the court could have held the Clan Mackenzie liable for the non-exhibition of a torch, unless upon the theory that it was her duty to keep one lighted all the time. As soon as the lookout became satisfied that the Oregon either had not seen or had mistaken his light, he did what in the excitement of the moment seemed to him best. He hailed her, and continued to shout until just before the collision. It was a case of action *in extremis,* and, while it is possible that a bell might have called the attention of the approaching steamer, it is by no means certain that it would have done so, and whether the lookout acted wisely or not, he evidently acted upon his best judgment; and the judgment of a competent sailor *in extremis* cannot be impugned. Indeed, we are not prepared to say that a hail could not have been heard as far as a bell, and considering the character of the lookout that was kept on the Oregon, it is very doubtful whether a bell would have been heard or regarded. As we have already observed, it is not sufficient for the Oregon to cast a doubt upon the management of the Clan Mackenzie. In view of the clearness of her own fault, it is not unreasonable to require that she should make the fault of the other equally clear. This she has fallen far short of doing.

It is also argued with great insistence that the anchor light of the Clan Mackenzie was lowered when the Oregon first came in sight, and that such fault was the primary and sole cause of the collision. We have examined the testimony upon that point, which is slight, and are therefore of the opinion that the court was amply justified in refusing to make this finding.

Although this collision occurred in 1889, we have assumed that the original Code of 1864 applied to it, in view of the

exception in section 2 of the Revised Code " as to the navi-gation of such vessels within the harbors, lakes, and inland waters of. the United States." The question is immaterial, however, since the provisions of the Codes of 1864 and 1885 are substantially identical as to the requirements involved in this case, and we do not, therefore, find it necessary to express a decided opinion upon the point. Our conclusion is that the Oregon was solely in fault.

3. The courts below were also in error in entertaining juris-diction of the intervening petitions. These petitions were filed after a stipulation had been given for the release of the Ore-gon, upon the original libel of Simpson, to recover for the loss of the Clan Mackenzie. No new warrant of arrest was issued upon these petitions, but the claimant, the Oregon Short Line and Utah Northern Railway Company, was ordered to answer them, and, in the final decree, damages were awarded to the intervening petitioners, and the claimant ordered to pay into court the sum of $35,531.19, to be applied, first, to the pay-ment of the intervenors, and then to the payment of the orig-inal libel. We are unable to understand upon what theory this apportionment was made.

The stipulation given for the release of the Oregon was as follows:

"Whereas a libel was filed in this court on December 31, 1889, by John Simpson against the steamer Oregon, her tackle, apparel, and furniture, for the reasons and causes in said libel mentioned, and praying that the same may be con-demned and sold to answer the prayer of said libellant, and a claim has been filed by the Oregon Short Line & Utah North-ern R'y Co. and the said claimant and W. S. Ladd and Van B. De Lashmutt, sureties, the parties hereto, hereby consent-ing and agreeing that in case of default or contumacy on the part of the claimant or its sureties execution may issue against their goods, chattels, and lands for the sum of two hundred and sixty thousand dollars: Now, therefore, it is hereby stipu-lated and agreed, for the benefit of whom it may concern, that the stipulators undersigned shall be and are bound in the sum of two hundred and sixty thousand dollars, conditioned

that the claimant above named shall abide by and pay the money awarded by the final decree rendered in the cause by this court, or, in case of appeal, by the appellate court."

Here is a simple agreement to become responsible. for the final decree rendered in the cause in which the stipulation is given, and the words "for the benefit of whom it may concern" refer undoubtedly to the owners of the Clan Mackenzie, in whose behalf Simpson, the master, had filed the libel. We know of no authority which permits the liability of sureties upon such a stipulation to be enlarged by the inclusion of claims other than the ones which the stipulators agree to pay. To such a claim the surety may well reply *non in hæc foedera veni.* The stipulators may be so well satisfied that the claimant has a defence to the original libel as to be willing to take upon themselves the contingency of a decree requiring its payment, but they may neither know, nor be able to conjecture, what other demands may be made against the property.

In the case of *The Palmyra*, 12 Wheat. 1, 10, in which this court held that it had power to reinstate a prize cause after dismissal, the general liability of sureties upon a stipulation is thus stated by Mr. Justice Story : " Whenever a stipulation is taken in an admiralty suit, for the property subjected to legal process and condemnation, the stipulation is deemed a mere substitute for the thing itself, and the stipulators liable to the exercise of all those authorities on the part of the court, which it could properly exercise if the thing itself were still in its custody. This is the known course of the admiralty. It is quite a different question whether the court will, in particular cases, exercise its authority where sureties on the stipulation may be affected injuriously ; that is a question addressed to its sound discretion." .

In *Newell* v. *Norton*, 3 Wall. 257, the libellant originally proceeded against the vessel, the master and owner, and the pilot for a collision. The libel was subsequently amended, by leave of the court, by dismissing it as to the pilot, and sustaining it as against the vessel and her master or owner. This amendment was held to have been properly granted, inasmuch as it appeared that the liability of the sureties was neither

increased nor diminished by it. And in this connection the court quoted the familiar doctrine that "every person bailing such property is considered as holding it subject to all legal dispositions of the court." There was no intimation, however, that the liability of the sureties could be increased by the insertion of additional claims.

On the other hand, in the case of *The North Carolina*, 15 Pet. 40, appealed from the Court of Appeals of the Territory of Florida, a libel for salvage was filed originally against seventy-two bales of cotton. One Houseman appeared as claimant, and gave a stipulation for its agreed value. The Superior Court of the Territory decreed restitution of the seventy-two bales. Houseman appealed to the Court of Appeals of the Territory, where the libellant proceeded for one hundred and twenty-two bales taken in salvage, charged that it was forcibly and wrongfully taken, and claimed damages for the marine tort. The Court of Appeals sustained this claim for the whole amount, and made a personal decree against Houseman beyond the sum for which the stipulation was taken. This was held to be error, the court saying that in so far as the seventy-two bales were concerned, either party was authorized to make amendments, or introduce new evidence, in order to support his title in the appellate court. But the libellant could not introduce a new subject of controversy, by bringing into the case the additional fifty bales, or make a decree against the claimant *in personam*.

Nearer in point, and almost exactly analogous in principle, is the case of *The Nied Elwin*, 1 Dodson, 50. This vessel, sailing under Danish colors, was captured by a privateer, and subsequently restored, by consent, to the owners. A claim was interposed for the cargo by a firm in Copenhagen, to whom the judge restored four-sevenths, and ordered further proof of the remainder. Bail was given to the captor in double the appraised value of the latter, and subsequently the judge pronounced the goods to be Danish property, and apparently ordered it to be returned to the owners. The King's advocate then moved for the condemnation of the property to the Crown in consequence of hostilities since declared between

England and Denmark, and also for a monition against the bail to answer the adjudication.

He argued that the bail bond should be considered as a substitute for the thing itself; that it was not confined to the captor, to whom it was given, but was to answer all questions relative to the property, which might arise before the ultimate adjudication of the cause; that the Crown must be considered as identified with the captor, and that, in case of property condemned to the Crown, instead of the captor, by whom the proceedings were originally instituted, the responsibility of the bail was indisputable.

Sir William Scott, (afterwards Lord Stowell,) in delivering judgment, said that the question was whether the persons who had given bail were subject to the demands of the Crown to account for the value of the goods. At the time the property was delivered on bail, the question was whether it belonged to subjects of Denmark. If so, the claimant would be entitled to restitution. The court announced that it could not entirely concede to the position that these bonds were mere personal securities, given to the individual captors, but they were regarded as pledges or substitutes for the thing itself, "in all points fairly in adjudication before the court." "But," said he, "the question still recurs, has the Crown the right to enforce payment from these parties in the event, which has since occurred, of Danish hostilities? I am of opinion that it has no such right. . . . The court does, indeed, upon the intervention of hostilities accept the old proceedings, and upon them pronounce for the interest of the Crown; but it does so merely for the purpose of saving time and expense, and not with any view of fixing a responsibility upon those who have given bail to answer a very different question. If the court were to accede to the prayer of the Crown upon this occasion the effect would be monstrous; it would extinguish altogether the practice of delivering property upon bail, a mode so much encouraged by the court and by the legislature. No British merchant would become security for foreign claimants in any case, if he should be considered responsible to the extent of such a possible contingence as that of a subsequent intervention of hostilities."

The gist of this opinion is that, if the change in the case had been merely that of substituting the Crown for the original captors, the bail would have been responsible, but that the subsequent intervention of hostilities so far changed the original cause of action as to exonerate the bail. In other words, the contract of a surety, whether at common law or in admiralty, is one *strictissimi juris*, and cannot be changed by implication. While the bail is intended as a substitute for the property itself, it is only such, as stated by Sir William Scott, " in all points fairly in adjudication before the court."

In the case of *The Saracen*, 2 W. Rob. 451, 457; *S. C.* 4 Notes of Cases, 498, 507, a contest arose between different parties injured by a collision over the proceeds of the sale of the libelled vessel. In delivering his opinion with respect to certain questions of practice which arose in the case, Dr. Lushington observed : " In concluding my remarks upon this part of the case, I may here observe, that if bail had been given in the present instance, such bail, I apprehend, would have been responsible only to the plaintiffs in the action which they had bailed. It could not, I conceive, for a moment be contended that the claimants bringing the subsequent action would have any title to recover against such bail, or to participate in any fund which they might bring into the registry of the court in discharge of their liabilities as bail." A similar observation was made by the same eminent judge in the subsequent case of *The Clara*, Swabey 1, 4. See also *The William Hutt*, Lush. 25.

The case of *The T. W. Snook*, 51 Fed. Rep. 244, is exactly in point. In this case a vessel was arrested for damages done to another vessel by a collision, and was released upon bond. Afterwards an insurance company intervened, claiming that the cargo of the libellant vessel had been insured by the company, and had been totally destroyed by the collision. A decree was rendered condemning the respondent vessel. *Held*, that the insurance company should not be allowed to be let in to share in the decree to the extent of what might remain of the penalty of the bond after satisfying the decree in regard to the damage to the other vessel, since the bond was given

only to satisfy the cause of action sued for in the original libel. The case of the *Oregon* was cited, but Judge Blodgett held it to be inapplicable to the facts of that case. We find it impossible to distinguish this case from the one under consideration. It was quoted with approval at the last term of this court in the case of *The Haytian Republic,* 154 U. S. 118, 127, in which a vessel libelled for smuggling, and discharged upon giving the bond required by law, was held to be subject to a libel in another district for another offence alleged to have been committed prior to the offence charged in the first libel.

The District Judge, in his opinion upon exceptions to certain of these petitions, quotes general admiralty rule 34 as authority for the proposition that, if third parties intervene in any admiralty case, the other party or parties in the suit may be required, by order of the court, to make due answer. This is entirely true, but the rule has reference only to those cases where the vessel is still in custody, or where she has been sold and the proceeds of sale paid into court. If still in custody when intervening petitions are filed, the vessel cannot be released until a stipulation is given to answer all the libels on file. But if, after the stipulation is given, and the vessel is discharged from custody, other libels are filed, a new warrant of arrest must be issued, and the vessel again taken into custody.

We think the court must have confounded a stipulation given to answer a particular libel with a stipulation for the appraised value of the vessel, under the limited liability act, which, by general admiralty rule 54, is given for payment of such value into court whenever the same shall be ordered, and in such case the court issues a monition against all persons claiming damages against the vessel, to appear and make due proof of their respective claims. And by rule 55, after such claims are proven and reported, "the moneys paid, or secured to be paid into court as aforesaid, or the proceeds of said ship or vessel and freight . . . shall be divided *pro rata* amongst the several claimants, in proportion to the amount of their respective claims." By rule 57, if the ship has been

already libelled and sold, the proceeds shall represent the same for the purpose of these rules. In all the cases cited, in which it has been said that the stipulation is a substitute for the thing itself, the remark has been made either with reference to the particular suit in which the stipulation is given, or with reference to a stipulation for the appraised value of the vessel, where the stipulation stands as security for any claim which may be filed against her up to the amount of the stipulation. Thus in *The Palmyra*, 12 Wheat. 1, it was held that the court possessed the power to reinstate any case dismissed by mistake upon the ground that the stipulators were liable to the exercise of all those authorities upon the part of the court, which it could properly exercise, if the thing itself were still in its custody. See also *The Ann Caroline*, 2 Wall. 538; *The Wanata*, 95 U. S. 600, 611; *The Webb*, 14 Wall. 406; *United States* v. *Ames*, 99 U. S. 35; *The Union*, 4 Blatchford, 90.

The injustice of holding the sureties in this particular case liable to the intervenors is the more manifest from the decree that was entered requiring their claims to be paid before that of the principal libellant. If it so happened that the sureties were unable to respond to the full amount of their stipulation, or to an amount sufficient to pay all the claims, the result would be that the intervenors, who had taken no steps to arrest the vessel, and were admitted under the original libel of Simpson, might be able to appropriate to themselves the whole or the greater part of the fund, and leave the original libellant wholly unprovided for. A proposition which would bring about this result surely cannot be a sound one.

The decree of the Circuit Court must, therefore, be

*Reversed, with costs to the original libellants as against the steamship Oregon, and with costs to the Oregon as against the intervenors, and the case remanded to the Circuit Court for further proceedings in conformity with this opinion; without prejudice, however, to the right of the court below, or of the District Court, in its discretion, to treat the intervening petitions as independent libels, and to issue process thereon against the steamship Oregon, her owners or charterers, or to take such other proceedings therein as justice may require.*