231 F.2d 319
 MARINE FUEL TRANSFER CORP., as owner of THE MERRY QUEEN and
her cargo of fuel oil, Libelant-Cross-Appellant,
v.
THE RUTH, Robert B. Wathen, Claimant-Appellant.
JAMES HUGHES, Inc., as owner of THE GOSSAN, Libelant-Appellee,
v.
THE MERRY QUEEN, Marine Fuel Transfer Corp.,
Claimant-Cross-Appellant, The Ruth, Robert B.
Wathen, Claimant-Appellant.
 Nos. 285 and 286, Docket 23861, 23862.
 United States Court of Appeals Second Circuit.
 Argued March 7, 1956.
Decided March 26, 1956.
 
 Mahar & Mason, New York City (Frank C. Mason, New York City, of Counsel), for libelant and claimant-cross appellant Marine Fuel Transfer Corp.
 Krisel, Beck & Taylor, New York City (Max Taylor and Maurice A. Krisel, New York City, of Counsel), for appellant and cross-appellee Robert B. Wathen.
 Macklin, Speer, Hanan & McKernan, New York City (Leo F. Hanan and Charles J. Carroll, Jr., New York City, of Counsel), for libelant-appellee, James Hughes, Inc.
 Before CLARK, Chief Judge, MEDINA, Circuit Judge, and GALSTON, district judge.
 MEDINA, Circuit Judge.
 
 
 1
 At about four o'clock in the morning of December 15, 1949, the Merry Queen, a self-propelled tanker, collided with the barge Gossan in tow of the tug Ruth, in the East River in the vicinity of Hunts Point, New York. The issue before us on this appeal is whether the collision was due to the fault of the Merry Queen or the Ruth, or both. The Gossan is concededly entitled to recover in any event. The trial judge held it was a case of both to blame.
 
 
 2
 The Ruth with two barges in tow, the Donnelly and the Gossan, had come up the sound from Providence for New York. The current changed to flood in the neighborhood of Throggs Neck and the Ruth flotilla made for the anchorage off Hunts Point. As she hove to off the mouth of the Bronx River the Donnelly was anchored, with the Ruth alongside, and the crew was proceeding to take in the 600 feet of hawser on the Gossan, when the collision occurred.
 
 
 3
 The Merry Queen had come up the East River bound for Mount Vernon, by way of Eastchester Creek, on a course East 1/2 South. Ahead of her was a flotilla consisting of two tugs, and three scows heavily laden with trap rock. The tug New Rochelle was in the lead with two of the scows harnessed behind her; the tug Hartford was assisting, in a position immediately behind the starboard scow, with the third scow to her port.
 
 
 4
 There was little or no wind and the Merry Queen was 'bowling along' at about 9 or 10 knots, with a favoring current of 2 or 3 knots. The night was clear and the visibility was good. As the Merry Queen came past Riker's Island she was naturally gaining fast on the slower moving New Rochelle flotilla just ahead and on the same course.
 
 
 5
 As usual the eye-witnesses give contradictory accounts of what happened. The version of those aboard the Ruth is to the effect that the Gossan was either within or on the edge of the anchorage, that the Ruth's searchlights had been playing on the Gossan for 'ten minutes or more' prior to the collision; and that, for some unexplained reason, the Merry Queen, at full speed ahead, plowed into the anchorage and hit the Gossan. This version of the collision, which flies in the face of common sense, was repudiated by the trial judge; and we are at a loss to understand why so much of the argument proffered on behalf of the Ruth is based upon the assumption that the facts are in accord with the testimony which the trial judge rejected. We comment on this merely because it is a practice all to often followed in these collision cases and it seems to us to be a mere waste of time, unless there is some basis for a contention that findings are clearly erroneous, which is far from the case here. See McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Schroeder Bros., Inc., v. The Saturnia, 2 Cir., 226 F.2d 147.
 
 
 6
 The true state of affairs, as found by the trial judge, was that the Gossan was not far from the middle of a 2,000 foot channel, in a busy thoroughfare. There were no searchlights played upon her by the Ruth, nor were any warning signals whatever given to the New Rochelle flotilla and to the Merry Queen, whose lights were plainly visible. As she lay there crosswise in mid-channel and headed North-Northwest, the heavily laden Gossan, 167.3 feet long and 35.6 feet abeam, with little or no headway, was a menace to navigation. She did carry running lights and two lights astern, but these were of the oil variety and the port running light was so dim as not to be visible more than a few feet away. Accordingly, the trial judge very properly found that the Ruth was at fault for leaving too long a tow line between the Ruth and the Gossan, and for not performing the maneuver of shortening the hawser entirely in the anchorage zone, where there was plenty of room, rather than while the Gossan was in midchannel. The remaining specifications of negligence urged against the Ruth may be disregarded as surplusage.
 
 
 7
 Cases holding that, where a vessel is at anchor or at rest and without appreciable headway, others must keep clear or sustain the burden of proving that they are without fault, The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943; Carr v. Hermosa Amusement Corp., 9 Cir., 137 F.2d 983, certiorari denied 321 U.S. 764, 64 S.Ct. 520, 88 L.Ed. 1060; Britain S.S. Co. v. J. B. King Transp. Co., 2 Cir., 131 F. 62; The Col. John F. Gaynor, 3 Cir., 130 F. 856; see also Marsden's Collisions at Sea, p. 39 ff. (9th ed. 1934), are obviously inapplicable. Here there was ample proof of fault on the part of the Ruth. Moreover, but for the well-established but illogical rule requiring an equal sharing of the loss where both vessels are to blame, Ulster Oil Transport Corp. v. The Matton No. 20, 2 Cir., 210 F.2d 106, the apportionment here would be heavily weighed against the Ruth.
 
 
 8
 The fault of the Merry Queen is not so clear. Her captain, Jacobsen, whose testimony made a favorable impression upon the trial judge, says that he did not notice the Gossan until he was about 300 or 400 feet away, when a black hulk loomed up dead ahead, that he could not tell her bow from her stern or whether she was under way, and that it was not until the time of the collision or shortly after the collision that he saw the dim red light and the two white lights. His explanation was that the white lights on the Gossan became merged with the lights of the New Rochelle flotilla just ahead. But he did admit seeing the two white lights but claimed that 'they disappeared' shortly before the impact. Apparently, according to Captain Jacobsen, these two lights at first seemed to be one above the other and 'then they were side by side,' 'it happened it was the lights on the barge Gossan.'
 
 
 9
 While this testimony is not entirely clear we see no reason why the trial judge should not have accepted it and made it the basis of his finding of fault on the part of the Merry Queen, i.e.: 'The moment these lights disappeared from his view it was his duty to reduce his speed. This negligence contributed to the happening of this collision.'
 
 
 10
 Moreover, the New Rochelle flotilla, which the trial judge found to be within 1,000 feet of the Gossan at the time of the collision, barely missed hitting her. Only a last minute sharp swerve to starboard by the New Rochelle, accompanied by a reversing of the engines of the Hartford, succeeded in keeping the flotilla away from the Gossan by a scant 6 or 7 feet. This maneuver should have been plainly visible to Captain Jacobsen, following directly behind and on the same course. And, if he saw it, it was plainly Captain Jacobsen's duty to slow down. His failure to see it or sooner to make out the two lights on the stern of the Gossan probably account for his failure to reduce speed.
 
 
 11
 While the opinion below is not clear on the point, there seems to be an intimation that fault can be ascribed to the Merry Queen for failing to sound a passing signal, as she was fact closing in on the New Rochelle flotilla. But, even assuming that the circumstances required the giving of such a signal, we do not think the failure to give it constitutes any breach of duty to the Gossan nor that it was a proximate cause of the collision.
 
 
 12
 Affirmed.