REDERIET FOR M/T SEVEN SKIES, as owner of the M/T Seven Skies, Libellant,

v.

S/S NORTH DAKOTA, her engines, etc., and Texaco Inc., Respondent.

TEXACO INC., as owner of the S/S North Dakota, Cross-Libellant,

v.

M/T SEVEN SKIES, her engines, etc., and Rederiet For, Claimant and Cross-Respondent.

United States District Court
S. D. New York.
March 7, 1962.

---

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for libellant and cross-respondent, Eugene F. Gilligan, Eli Ellis, New York City, of counsel.

Brush & Michelsen, New York City, for Texaco, Inc., Joseph M. Brush, New York City, of counsel.

CLANCY, District Judge.

1. Libellant's tanker SEVEN SKIES, bound for Port Newark encountered dense fog while approaching Ambrose Light Vessel in the early morning of June 26, 1959. Her radar revealed that there were numerous anchored vessels in the vicinity of the lightship. Because of their presence and of the bad fog conditions the master of the SEVEN SKIES anchored the vessel in a position approximately four miles due south of the Ambrose Light Vessel at about 0520 E.S.T. The anchored vessel nearest to the SEVEN SKIES was about a mile northwest.

2. At all times after anchoring a seaman stationed on the forecastle head and one stationed aft alternated ringing the ship's fog bell and the gong aft each half minute. The ship's radar was kept in operation and was constantly scanned. The SEVEN SKIES lay heading approximately due east.

3. Immediately prior to the collision the second officer was on watch on the bridge. The master too was on the bridge. The engines were on standby and an engineer was on duty in the engine room. The SEVEN SKIES was anchored with 45 fathoms of her starboard anchor chain in the water. The fog conditions had improved somewhat so that the visibility was about one-half mile all around the tanker. There was practically no wind and the tide was negligible.

4. Respondent Texaco's vessel, the NORTH DAKOTA, a fully laden tanker, bound for Bayonne, passed abeam of Barnegat Light Vessel about two and one-half miles from shore, at 07:56 that morning. At that time her course was

set at 004 for the leg of the journey from Barnegat to Ambrose Light.

5. As the NORTH DAKOTA proceeded her master and third officer were on the bridge, her quartermaster was at the wheel, and a lookout on her bow. The vessel's radar was turned on, but because it had not been operating properly, the instrument was not being relied upon in the vessel's navigation. The NORTH DAKOTA was traveling at its full maneuvering speed, about 16 knots, at ten o'clock. At that time the fog lifted somewhat and visibility increased but remained hazy. The vessel's fog signals were thereafter not sounded.

6. At approximately 10:20, the course of the NORTH DAKOTA was changed from 004 to 000, to conform to the radio bearing of Ambrose Light Vessel, near which her master intended to take on a pilot. At about this same time the NORTH DAKOTA's radar picked up a vague pip or target about seven and one-half miles ahead. A number of other pips or targets at an unascertained distance to the northward indicated a group of vessels anchored in that area. Those in charge of the NORTH DAKOTA mistook the isolated pip, which was in fact the SEVEN SKIES, for the Ambrose Light Vessel. No cross check was effected by radio with Scotland Light Vessel. The NORTH DAKOTA made for it.

7. During the approach to New York Harbor, those on the NORTH DAKOTA had heard the fog signals of a tanker also proceeding toward Ambrose Lightship about two miles to starboard. At about 10:30 the vessel to starboard came into view, slightly ahead of the NORTH DAKOTA and moving at a faster rate. From approximately 10:15 on these two vessels were observed to the south by the officers of the SEVEN SKIES. They concluded that the NORTH DAKOTA would pass about one-half mile astern of the SEVEN SKIES and the other vessel would pass well forward of her.

8. At a little after 10:30 a. m. both the lookout and the master of the NORTH DAKOTA heard, in the distance, the two toned diaphone fog signal of the Ambrose Light Vessel. The signals of the tanker to starboard could also be heard. No other fog signals were heard by those on board the NORTH DAKOTA.

9. At 10:47 while she was yet doing 16 knots, the captain of the NORTH DAKOTA heard an alarm signal and knew it must be from the vessel whose pip showed dead ahead on his radar. (The captain of the SEVEN SKIES testified to the signal but was uncertain of the time). He slowed for a minute and then saw the vessel in the fog bank ahead and stopped, then reversed his engines, and put his wheel hard right. The vessel responded sluggishly to these recourses and had swung only ten or fifteen degrees to starboard at the time of the collision. In less than three minutes his vessel struck. He was moving about three knots an hour when it struck.

10. The SEVEN SKIES had maintained a constant radar watch on the NORTH DAKOTA and when one-half mile off she was sighted by the chief officer, heading to meet the SEVEN SKIES midship. The chief officer called out to the master on the bridge whose attention had already been drawn to the vessel by the second mate observing her by radar. A warning whistle of a short, long and short blast was sounded by the SEVEN SKIES. This signal was repeated several times. At all times, as stated, the bell forward and the gong aft had been kept ringing every minute.

11. Shortly before the collison, the engines of the SEVEN SKIES were ordered slow, then half astern and then stopped. The SEVEN SKIES' master determined it was impossible to get any sternway on the loaded ship before the impending collision. He also determined that since there was no current, paying out the anchor chain would not accomplish anything.

12. At 10:52 a. m. the NORTH DAKOTA heavily struck the SEVEN SKIES starboard side near the forecastle head. The bow of the NORTH DAKOTA pene-

trated the hull of the SEVEN SKIES causing substantial damage to both vessels. The NORTH DAKOTA held herself in the side of the SEVEN SKIES for about ten minutes and then backed clear at the request of the SEVEN SKIES' master.

## CONCLUSIONS OF LAW

■■ 1. There is a presumption of fault which attaches a moving vessel colliding with an anchored vessel. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943; Gulf of Mexico, 2 Cir., 281 F. 77. Furthermore, the evidence clearly demonstrated the negligence of the NORTH DAKOTA in moving at an excessive speed in fog, and when an unreliable radar left her navigators ignorant of the precise position of other vessels. Her navigators were further negligent in failing to make a radio cross check on Scotland Light Vessel.

2. Her negligence in these respects was the sole proximate cause of the collision and libellant's damages.

■ 3. The SEVEN SKIES was not guilty of any negligence in the choice of its anchorage position. The SEVEN SKIES, while at anchor, observed all the necessary precautions as set forth in the International Rules of Navigation, 33 U.S.C.A. § 145m Sub. (c) (iv).

4. The libellant is awarded judgment against Texaco, Inc. and the S. S. NORTH DAKOTA for the amount of its damages.

5. The cross libel of Texaco, Inc. is dismissed.

Approaching Ambrose Light Vessel the NORTH DAKOTA was moving at her full maneuvering speed of sixteen knots, though her radar had not been functioning properly and she was depending on her lookout. The lookout has testified that the weather immediately preceding the collision was hazy with fog patches. Her captain said that fog patches are not easily identifiable as such, for at times they blend into the prevailing gray background. Thus a lookout might well be unaware of the existence of a patch until too late for a vessel moving at a rate of sixteen knots to avoid anything hidden by it.

Finding 9 states the Court's conclusion of fact from the evidence. The captain of the NORTH DAKOTA said that he first saw the SEVEN SKIES one-half mile away. One of the other witnesses estimated the distance from one-third to a half mile. The others said a half mile or more. The NORTH DAKOTA's captain said the collision followed in three minutes. The deck bell book is to the same effect and the other witnesses were not in serious disagreement. This necessarily means that the NORTH DAKOTA's average speed during the three minutes was ten miles an hour which the Court finds means a decreasing speed from sixteen knots, her full navigating speed when the SEVEN SKIES became visible, to the three knot speed at which everyone thought she struck.

■■ A vessel must proceed in fog at a moderate speed. Rule 16, 33 U.S.C.A. § 145n. Moderate means that a vessel proceeding in limited visibility must move at such a rate as will enable it to stop before colliding with another. The Express, 2 Cir., 212 F. 672; Anglo-Saxon Petroleum Co., Limited of London, England v. United States, 2 Cir., 222 F.2d 75. The NORTH DAKOTA maintained a speed of sixteen knots until four minutes before the collision, although both the lookout and the Captain were aware of fog patches about them with their limited visibility. The fact that the NORTH DAKOTA was unable to stop before striking an anchored vessel visible at one-half mile is clear proof that the vessel was violating the rule.

Although the NORTH DAKOTA took a radar bead on the pip of the SEVEN SKIES and mistakenly, but deliberately ran her down, the respondent argues that the SEVEN SKIES was negligent in not selecting another anchorage. This, of course, is an attempt to put on the SEVEN SKIES the onus of the mistakes and omissions of the NORTH DAKOTA.

It also involves the wholly groundless assumption that a vessel moving north coastwise preempts the necessary space for the maintenance of her course. The purpose of the recommendation by the U. S. Coast Pilot (p. 162) of a berth below Scotland Light is intended to safeguard the telegraph cables. There is nothing in it to suggest it was ever intended to shelter vessels that adopt its suggestion, or relieve vessels from their duty to proceed cautiously in times of limited visibility. The paragraph in fact seems to assume that vessels will drop anchor in other nearby areas since it provides: "The companies state that they will be glad to compensate any vessel which, having fouled the cable, cuts away its anchor and chain in order to save the cable from interruption." The Coast Pilot then goes on to suggest that vessels anchor in the area southward of Scotland Lightship. The expert witness produced by the respondent has testified that he would not recommend anchoring in the area selected by the SEVEN SKIES. The question however is not whether another location seems preferable to a person ashore in 1962 but whether the SEVEN SKIES in her circumstances was negligent in anchoring where it did. The cases which have held an anchored vessel to be contributorily negligent have found it anchored in a narrow channel. See The Limon, 1 Cir., 35 F.2d 730. The basis for holding the anchored vessel negligent is that it was unnecessarily so placed as to create a dangerous situation for passing ships. Thus Atlantic Refining Co. v. Moller, 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168. The SEVEN SKIES was anchored on the high seas in a position about seven miles from the Jersey coast and twelve from the Long Island Coast. The pip of the SEVEN SKIES had showed up on the NORTH DAKOTA's radar screen at a distance in excess of seven miles. Instead of setting a course which would have brought the ship safely past the SEVEN SKIES, those in charge of the NORTH DAKOTA altered course so as to head directly for her in the mistak-

en belief that she was the Ambrose Light Vessel. The third mate has admitted that a cross check by means of a radio bearing on Scotland Light Vessel would have informed them that SEVEN SKIES pip was not that of Ambrose. There was no real deficiency in the charts of the SEVEN SKIES and if she had none at a'l their absence would not have contributed in any way to the collision. The only contribution the SEVEN SKIES made to the occurrence of the collision was her wholly innocent presence where she was anchored. She was deliberately run down.

The libellant has introduced the testimony of the officers and seamen on the SEVEN SKIES that at all times the bell and gong, fore and aft were being rung and that an emergency whistle was blown when the NORTH DAKOTA was first sighted. Respondents witnesses all said that prior to the sighting of the SEVEN SKIES these signals were not heard. At the time the SEVEN SKIES came into sight Captain Gunderson has admitted that he heard her bell, gong and whistle. At the speed the NORTH DAKOTA was traveling she would only come within hearing distance of the bells a few minutes before the accident. In addition the vessel to starboard had been constantly sounding its fog whistle and the NORTH DAKOTA had only recently picked up the signal of the Ambrose Light Vessel. When all these factors are considered it is not surprising that the NORTH DAKOTA did not hear the SEVEN SKIES' signals until she was about a half mile away.

The respondents also maintain that the SEVEN SKIES was at fault for its failure to take steps to avoid the collision when the danger was or should have been apparent to those in charge of her. When the NORTH DAKOTA emerged from the fog the captain of the SEVEN SKIES was presented with the situation of a vessel about one-half mile off moving at an excessive speed heading directly for her. Respondent failed to suggest any promising recourse other than backing her engine. It has been

found that the engine was reversed for an instant and then stopped. The Court accepts the testimony of Captain Moller that in these circumstances any action he might have taken would have proved futile.