## THE GULFSTAR.
## SUN OIL CO. v. THE GULFSTAR et al.
### No. 7934.

Circuit Court of Appeals, Third Circuit.
Argued Nov. 19, 1942.
Decided June 21, 1943.

Eugene Underwood, of New York City (Shields, Clark, Brown & McCown, of Philadelphia, Pa., and Burlingham, Veeder, Clark & Hupper and Chauncey I. Clark, all of New York City, and Samuel B. Fortenbaugh, Jr., of Philadelphia, Pa., on the brief), for appellant.

Leslie C. Krusen, of Philadelphia, Pa. (Krusen, Evans & Shaw, of Philadelphia, Pa., and Duncan & Mount, of New York City, on the brief), for appellee.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

This is an appeal in an admiralty suit brought by the Sun Oil Company to recover for injuries sustained by its motor tank vessel "Sun" in a collision with the steam tank vessel "Gulfstar" owned by the Gulf Oil Corporation of Pennsylvania. The district court, holding the Gulfstar at fault and the Sun free from fault, decreed that the libellant should recover from the Gulfstar and its claimant the damages sustained by reason of the collision. 42 F.Supp. 440. The Gulf Oil Corporation of Pennsylvania, respondent and claimant of the Gulfstar, has appealed.

The collision took place about one o'clock A. M. on July 16, 1937, in the Gulf Stream off the east coast of Florida at a point approximately fifteen miles northeast of Fowey Rocks Light. At the time of the collision the Sun was bound for a port in the Gulf of Mexico and the Gulfstar was bound for Philadelphia. The night was clear with no moon but with average visibility. There was a light breeze and the sea was smooth.

Shortly after 9 o'clock P. M. on July 15th the Sun, then abeam of Great Isaac Light House, set her course at 222° true and maintained that course until about 1.02 o'clock A. M. The time referred to is that shown by the Sun's clocks. During this period of time the Sun proceeded at normal full speed of between 11 and 11½ knots through the water. For approximately one-half hour before the collision the Gulfstar was steering a course of 1° true and was proceeding at her usual speed of 9.8 knots through the water. At about 12.20 o'clock A. M. the Sun's lookout reported and the watch officer saw the range lights of the Gulfstar bearing from two to three points on the port bow and from seven to eight miles away. Between 12.40

o'clock and 12.45 o'clock A. M. the green light of the Gulfstar likewise was observed.

The Gulfstar first sighted the Sun about 30 minutes before the collision bearing about three points on the starboard bow and apparently on a course crossing that of the Gulfstar from starboard to port at an angle of about 45°. At about the same time the United States Submarine S-30 accompanied by the Submarine S-1 was proceeding on a course of true north running on the surface at a speed of approximately 5½ knots. The S-1 maintained a position broad on the bow of the S-30 with the tracks of the vessels about 500 yards apart. The Gulfstar for some time prior to the collision was astern of the submarines proceeding on substantially the same course and overhauling them at the rate of about 4 knots.

In the crossing situation which was thus developing between the Sun and the Gulfstar the Sun was the privileged vessel and had the right of way over the Gulfstar, the S-30 and the S-1. According to the courses and speeds being maintained by the Sun and the Gulfstar, the latter would cross the course of the Sun a mile or more ahead of her, while it would be necessary for the submarines to pass under the Sun's stern.

About five minutes before the collision the Gulfstar did in fact cross the course of the Sun a mile or more ahead of her but within a minute thereafter the Gulfstar commenced a right swing after blowing a one blast signal and in about two minutes had swung sufficiently to the right to open her red (port) light to the Sun, whereupon the Gulfstar steadied on and headed directly for the Sun. About two or three minutes prior to the collision the watch officer of the Gulfstar ordered her engines to increase their speed to a maximum.

The Sun's watch officer maintained her course and speed for about two minutes after first observing the Gulfstar beginning to cross her course. When the Sun's watch officer first observed the Gulfstar swinging to the right he believed it to be a steering yaw and held the Sun's course and speed for the time being but at approximately 1.02 o'clock A. M. when the Gulfstar had swung sufficiently to the right to show both her red and green lights to the Sun and had steadied on a course heading directly for the Sun her watch officer put the Sun's wheel hard right and blew one blast on the whistle. He did so' in the belief that action by him was necessary to avoid a collision, that the Gulfstar would continue to swing to the right and that a collision might thereby be averted.

The Gulfstar, however, instead of resuming her right swing continued to steady on a heading directly at the Sun which was then about three-quarters of a mile away. The Sun's watch officer then ordered her engines reversed, keeping her wheel hard right. As a result of this order the Sun's engines were actually turning astern for about one minute before the collision. Very shortly before the collision the Gulfstar's watch officer put her wheel hard right and kept it there until after the collision. During all this time the Gulfstar continued at top forward speed.

At about 1.04 o'clock A. M. the vessels collided, the bluff of the Gulfstar's port bow striking the port side of the Sun somewhere abreast of No. 1 tank. The angle of impact was about 1 point. The port sides of the two vessels raked along each other until there was contact between both sterns, after which the vessels cleared each other.

These are the facts regarding the collision as found by the district court and our independent consideration of the evidence leads us to adopt them as correct. They are strongly controverted by the witnesses for the Gulfstar who contend that the Sun swung to the left rather than to the right while the Gulfstar was attempting to pass under her stern and thereby caused the collision. We agree, however, with the district court that this version of the collision cannot be accepted for the reasons ably stated in the very satisfactory and convincing opinion of Judge Kalodner, 42 F.Supp. 440.

As Judge Kalodner has pointed out, the record made by the Sperry compass and course recorder, with which the Sun was equipped, which record was in our opinion properly proved, demonstrates unerringly that the Sun's change of course prior to the collision was to the right and not to the left. The Gulfstar strongly urges that the testimony of the officers of S-30 as to their observations of the vessels at and before the time of the collision supports the story of the Gulfstar rather than that of the Sun. Although there may well be an inconsistency between their testimony and the exaggerated version of the Sun's story as presented by the Gulfstar experts we find no inconsistency between the testimony of the S-30's officers and the facts as we have

found them. The difficulty with the expert's testimony is that it was based upon the premise that the testimony of the eye witnesses as to times and distances possessed a literal accuracy which under the circumstances clearly it could not have had.

Under these circumstances the fault of the Gulfstar was clear and egregious. The Sun, as the vessel approaching from the starboard, had the right of way under Article 19 of the International Rules (33 U.S.C.A. § 104) and it was, therefore, the duty of the Gulfstar as the burdened vessel to keep out of the Sun's way. This it was proceeding to do by continuing on its course to a point where it had crossed the Sun's bow at least a mile ahead of that vessel. The Gulfstar was thus in the clear when without any apparent reason it commenced a right swing which brought it back directly into the path of the Sun. When instead of continuing its right swing so as to recross the Sun's course and get out of her way the Gulfstar steadied on a course which headed directly for the Sun, it not only flagrantly violated Article 19 but made imminent the danger of collision which shortly resulted.

It is strongly urged by the Gulfstar that, granting that she was at fault, the Sun was also at fault in not maintaining her course and speed as required by Article 21 of the International Rules (33 U.S.C.A. § 106). It is true that Article 21 requires that in a crossing situation the vessel having the right of way shall keep her course and speed. This is subject, however, to the qualification indicated in the note to Article 21 that "When, in consequence of thick weather or other causes, such vessel finds herself so close that collision can not be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision." This qualification of the rule in Article 21 imposes a duty upon the privileged vessel to take affirmative action to avert a collision which is so imminent that it cannot be averted by the action of the burdened vessel alone. The qualification has the equally important effect of releasing the privileged vessel from what might under the circumstances amount to a fanatical adherence to the command of the article. A summary of the English law interpreting the Articles and its qualification in so-called "in extremis" situations is set forth in 30 Halsbury's Laws of England (Second Ed.) p. 762, as follows:

"When the stand-on vessel finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she also is bound to take such action as will best aid to avert collision. It has been said in reference to this duty that article 21 is the most difficult of all the regulations to understand and obey.

"The duty of the stand-on steam vessel to assist at the last in avoiding collision has been frequently discussed in recent cases. It is quite impossible to determine mathematically the point at which the stand-on vessel must act; these rules have to be construed so that men may act reasonably upon them. Where good seamanship would assume that collision cannot be avoided by the action of the give-way vessel alone, the case falls within the exception, even though in fact the give-way vessel could by her own action have averted collision."[1]

The decisions in the United States likewise stress the importance of the qualification to the rule contained in the note to Article 21. In the case of The Nordpol, 2 Cir., 1936, 84 F.2d 3 the Nordpol, the privileged vessel, kept her course and speed up to a point just before the collision. The Condor, the burdened vessel, made a sudden move across the bow of the Nordpol without warning. The Nordpol then turned to starboard in the general direction of the Condor in order to escape the collision but the maneuver was unsuccessful. The court said (pages 4, 5 of 84 F.2d):

"* * * as soon as it became apparent that the collision could not be avoided by the Condor alone, the Nordpol properly then attempted to escape.

---

[1] In S. S. Albano and Allan Line Steamship Co., Ltd., Law Reports [1907] A.C. 193, 207, the court said: "It must always be a matter of some difficulty for the master of a vessel which has to keep her course and speed with regard to another vessel which has to keep out of her way, to determine when the time has arrived for him to take action, for if he act too soon he may disconcert any action which the other vessel may be about to take to avoid his vessel, and might be blamed for so doing, and yet the time may come at which he must take action. Therefore he must keep his course and speed up to some point and then act, but the precise point must necessarily be difficult to determine, and some little latitude has to be allowed to the master in determining this."

"* * * Although the privileged vessel is required by rule to keep her course and speed, there may come a time when the privileged vessel is required to take action. * * * Such navigation has been approved by judicial authority. See The New York, 175 U.S. 187, 206, 20 S.Ct. 67, 44 L.Ed. 126; The Devonian, D.C., 110 F. 588."

The action which the navigator of the privileged vessel may take in the stress of immediate peril to his vessel and himself resulting from wrong maneuvers by the burdened vessel is not to be too freely criticised by those who navigating from the witness chair after the event may think that another course might have been better. In such circumstances an honest error in judgment by the navigator is not to be imputed as a fault to the privileged vessel. Thus in The Maggie J. Smith, 1887, 123 U.S. 349, 355, 356, 8 S.Ct. 159, 162, 31 L.Ed. 175, Justice Field said:

"The rule is well stated by counsel, that 'if one vessel is brought into immediate jeopardy by the fault of another, the fact that an order other than that which was given might have been more fortunate will not prevent the recovery of full damages;' or, as stated by the court of appeal of England, in the case of The Bywell Castle, 4 P.D. 219, as quoted in the case of The Elizabeth Jones, 112 U.S. [514], 526, 5 S.Ct. 468, [28 L.Ed. 812]: 'Where one ship has, by wrong maneuvres, placed another ship in a position of extreme danger, that other ship will not be held to blame if she has done something wrong, and has not been maneuvred with perfect skill and presence of mind.'"

Likewise in The Queen Elizabeth, 2 Cir., 1903, 122 F. 406, 409, Judge Coxe said:

"When the master of a vessel is confronted with a sudden peril, caused by the action of another vessel, so that he is justified in believing that collision is inevitable and he exercises his best judgment in the emergency, his action, even though unwise, cannot be regarded as a fault. 'The judgment of a competent sailor in extremis cannot be impugned.' The Oregon, 158 U.S. 186, 204, 15 S.Ct. 804, 39 L.Ed. 943. It is the duty of the court, as far as possible, to place itself in the position of the master and to endeavor to interpret the rules of navigation in the light of the perils and perplexities which surrounded him at the time—the impending danger, the excitement of the moment, the necessity for immediate action. Where a navigator of experience and good judgment acts, in such circumstances, his action, if within the limits of reasonable judgment and discretion, cannot be imputed to his vessel as a fault. If he acts upon his best judgment at the time it is sufficient, even though subsequent judicial investigation may show that he might have chosen a more prudent course. A master who the next moment may be sinking with his ship and crew cannot be expected to display the utmost coolness and deliberation. The Dimock, 1 Cir., 77 F. 226, 23 C.C.A. 123; The City of Augusta, 1 Cir., 80 F. 297, 25 C.C.A. 430; The Iron Chief, 6 Cir., 63 F. 289, 11 C.C.A. 196; The Havana, D.C., 54 F. 411; The Robert Healey, D.C., 51 F. 462."

It is because they respect the choice made by the navigator of a privileged vessel in extremis and not because they insist upon slavish adherence to the course and speed rule that the courts have at times upheld the action of such a navigator in maintaining his course and speed into collision. See Wilson v. Pacific Mail S. S. Co., 1928, 276 U.S. 454, 48 S.Ct. 369, 72 L.Ed. 651.

In determining whether the situation which in the case before us confronted the watch officer of the Sun when he changed her course and speed was one properly describable as "in extremis" within the rule of the cases we must consider the distance separating the two vessels and their respective speeds and maneuverability. From what we have already said about these factors it seems clear that in view of the wholly inexplicable and apparently irrational action of the Gulfstar in bearing down directly on the Sun a competent navigator might well have determined that the time for affirmative action by the Sun could then no longer be postponed. We think that after the Gulfstar headed directly for the Sun at top forward speed the watch officer of the Sun was entitled to conclude that the vessels were "in extremis" and that the Sun was under the obligation to take such action as in her navigator's best judgment would aid in averting the collision. We, therefore, conclude that the Sun was free from fault.

The decree of the district court is affirmed.