THE CYPROMENE.

(District Court, D. Oregon. February 24, 1905.)

No. 4,646.

COLLISION—STEAMER AND ANCHORED SHIP—EXCESSIVE SPEED IN NIGHT WITHOUT LOOKOUT.

The steamer Hassalo, owned by libelant, navigating the Columbia river in the night, came into collision with the ship Cypromene, which was anchored in a customary place of anchorage on the Oregon side of the river, where she had been placed on the evening before by a tug of libelant. The ship carried the regulation lights, and, while there was testimony to the existence of a fog bank around her, the weight of testimony showed clearly that her lights could be seen for a considerable distance, and were seen by people who looked after hearing the collision. The Hassalo was going at a speed of 15 miles, and had no lookout. The captain and pilot, who were in the pilot house, testified that they could see no lights until just before the collision, on account of the fog. The pilot knew that the ship was anchored in the vicinity, but supposed she was in a different place. *Held*, under the evidence, that there was not such fog as to require the ship to ring her fog bell, but that the collision was due solely

to the fault of the Hassalo in not having a lookout, and in going at an excessive speed in a place where anchored vessels were to be expected.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 211–215.]

In Admiralty. Suit and cross-libel for collision.

H. F. Conner, for libelant.

J. C. Flanders, for claimants.

BELLINGER, District Judge. This is a suit upon the libel of the Oregon Railroad & Navigation Company against the ship Cypromene, and the cross-libel of the owners of the ship, for damages caused by a collision between the ship and the company's steamer Hassalo, while the former was at anchor in the Columbia river, on the Oregon side, a short distance below Kalama. The accident occurred on the 5th day of October, 1902. On the preceding day the company's towboat the Oklahoma proceeded, with the Cypromene in tow, from Portland to Astoria, the company having engaged to tow the ship to the latter place. At about 7 p. m. of that day, October 4th, the Cypromene anchored in the Columbia river between Coffin Rock and Kalama, under the direction of the master of the tugboat, in the place and in the manner designated by him. This place of anchorage was a usual and customary place of anchorage for vessels bound from Portland to Astoria. As night came on, the proper and usual riding lights, consisting of white lights in the mizzen rigging and fore rigging, were displayed upon the ship. Shortly after 1 o'clock in the morning of the 5th, the company's steamer Hassalo, while on her way from Portland to Astoria, and while in or near her usual course, collided with the ship, to the injury and damage of both vessels.

It is alleged by the navigation company that, at the time of the collision and prior thereto, there was a light wind upstream; that the Cypromene was enveloped in a thick bank of fog, extending downstream from a point a short distance above the ship; that the weather was a little hazy, and the fog bank was so obscured that those in command of the Hassalo were not aware of its existence; that when the steamer entered this bank of fog her pilot and captain saw a light about one point on her port bow, and immediately thereafter the jib boom of the Cypromene appeared in the fog directly in front of the pilot house of the Hassalo, and the collision occurred before any measures could be taken by the latter's officers to avert it. The company alleges that the collision was caused by the gross negligence of the ship's officers and crew in failing to have any lookout or anchor watch on the deck of the ship, or to ring a bell during the period and at the intervals required by law in such cases, or to give warning of the position of the ship by the use of a lighted torch, or by shouting, or by taking any other means to acquaint those in charge of the Hassalo with the position of the ship, and that it was impossible to perceive the latter's position until too late to avoid a collision.

On behalf of the Cypromene, it is denied that the ship was at the time of the collision obscured by fog, or that there was any fog in her vicinity. It is admitted that no bell was rung on the ship, and that

no warning was given of her position by shouting or by a lighted torch, but it is alleged that under the circumstances these precautions were not required, and that the Hassalo could not have been better apprised of the ship's position than by the regulation anchor lights that were burning brightly at and prior to the collision, and it is denied that such lights were in any manner obscured. It is denied that the Hassalo was proceeding at the time of the collision at a moderate rate of speed, but, on the contrary, it is alleged that she was being navigated at full speed, and it is alleged that she is a fast boat, and that the collision occurred solely by reason of the negligence and want of care of the Hassalo in failing to observe the lights of the Cypromene, and by reason of her improper navigation, and of the failure to keep a lookout and watch as required by law.

The master of the steamer Fannie, Capt. Copeland, testifying for the libelant, says that he passed Kalama with his boat going down the river about 11 o'clock, possibly a little later, on the night of October 4th. When he reached a point about halfway between Kalama and Kalama River Point he struck a very thick bank of fog, which he had not seen before. He took his bearings, ran to Kalama River Point, got the echo from some trees there, turned around, and made his way to Farr's Dock on the Oregon side, probably some 1,500 or 2,000 feet above where the ship was anchored. The Fannie had much difficulty in landing because of the fog, but was finally, at about 20 minutes or half past eleven, tied up at a dock at Neer City some 250 feet above Farr's Dock. The fog continued dense down the river; above it was lighter. Saw the lights of the Hassalo dimly as she passed down the river, at a distance of between three and five hundred feet, and heard the crash of the collision and looked downstream, but could see no lights.

Sullivan, master of the Hassalo, testifies that the Hassalo's speed is about 15 miles an hour, and she was running at full speed when the collision occurred; that there was no lookout on the steamer at the time of the collision; at the time the testimony was taken the company had a man detailed to act as lookout. Knew that the Cypromene was at anchor somewhere down the river. Her captain was on board the Hassalo, and had requested the master of the latter to put him on board the Cypromene. Was expecting to find the latter at Doublebarrs Shoal or at Rainier. He testifies that Coffin Rock is an unusual place to anchor a loaded ship; that they do anchor light ships there. He and his pilot, Barton, were in the wheelhouse of the Hassalo at the time of the collision. They had been talking about the landings to be made. Capt. Sullivan's account of the collision is as follows:

"And we had passed there [the dock at the ferry landing] perhaps— It seemed to me a minute and a half or two minutes, and suddenly saw a light on the port bow. I was not paying particular attention ahead, although looking that way. And I remarked to the pilot— I saw that it must be something unusual; there should be no light there. I remarked to the pilot, what did he suppose that was. I looked at him, and I saw he had reached for the bell and pushed the lever over; he recognized there was something in his way. I next saw the jib boom of the ship coming over the hurricane deck. This jib boom caught the light screen and the guy lines of the pilot house, then the side posts, and tore them out, and, of course, checked the boat's speed in a measure; and, of course, the boat had been stopped. I will say, as soon as he saw the light, he rang the bell to stop. The boat drifted on by.

I told him to back the boat until the way was stopped, and I ran down below to see what happened. I went through the cabin, and saw that no one had been injured, or that no one had been knocked in the water; went down on the main deck; saw that the engines were not injured, the power was not disabled; went back to the speaking tube in the forward part of the boat, and told the pilot to turn around; told the pilot to go to Kalama, which he did. We were there only a few minutes. Very soon after leaving the ship, I noticed we ran into hazy weather again, or comparatively clear. I didn't notice this in particular, as, of course, I was occupied more in looking after the people—found they were frightened—and in trying to calm them. Q. How far were you away when you first saw the lights in the Cypromene, captain? A. Well, it appeared to me about the length of the boat. Q. How long is the Hassalo? A. 180 feet. Q. Was it foggy at that time, or otherwise? A. It was very thick. Q. How long had it been thick that way, and how long had you been proceeding through thick fog? A. I have no means of telling; I would have no means of knowing; there was no object ahead to see, no object on the side. The beach on the Washington shore is a flat sandy beach, with no background; for a long ways ahead there is no object except Coffin Rock light, which would probably be three-quarters of a mile, and we wern't looking for anything to give any idea of distance, and I have no way of telling; but it seemed to me that we just ran into it; there was nothing to indicate when we went into this fog."

This witness further says that it was quite a dark night, and the fog added to the darkness.

The testimony of Barton, the pilot, does not differ materially from that of Capt. Sullivan.

Larson, the pilot on the transfer boat at Kalama, a witness for the navigation company, testifies that the transfer boat left Goble for Kalama at 11 minutes past 1 (the collision occurred at 1:25). He doesn't remember whether he could see the lights at Kalama or that at Coffin Rock in leaving Goble; there wasn't much fog; on the Oregon side "there was a little fog, and down to Coffin Rock"; about 10:30 or 11 o'clock it was very foggy all the way from the ferry pontoon and down towards Coffin Rock; didn't see the Cypromene until he crossed at 5:15 in the morning; did not see her lights at all that night; looked for them on each trip after 10:40.

The testimony of Linnell, mate on the transfer boat, is substantially the same as that of the pilot.

Larkins, the master of the steamer Undine, a witness for the company, testifies that he was on the Undine the night of the collision, and was probably five miles up the river when it occurred. He landed at Kalama about 1:25, and remained about 10 minutes. Upon leaving Kalama, he shaped his course for Coffin Rock light; met the Hassalo about a quarter of a mile, or a little over, below the ferry, on the Washington side, apparently going to Kalama. The weather was a little hazy when the Undine left Kalama. There was a heavy fog overhead, but none on the water; low down on the water was a haze across the river; could see the Goble light, but nothing below that, as he "didn't observe at the time they were in port—didn't notice—any lights below the ferry light"; about halfway between Kalama and Coffin Rock ran into a dense fog; blew a fog whistle, and the Cypromene rang a bell almost abreast of the Undine, and then he saw the ship's lights, distant between two and three hundred feet; got within 150 to 200 feet of Coffin Rock before he saw the light; did not slacken his speed when he blew the fog whistle; had been run-

135 F.—36

ning at full speed all the way down the river. "It is impossible to run a steamboat on this river without running full speed. None of them comply with that law; not one of them."

Lawrence, the incline tender at Goble, testifies that it began to get foggy towards midnight; it was a kind of rolling fog; doesn't believe he saw the lights on the ship—didn't pay attention to it; heard the sound of the collision; it was pretty foggy, pretty thick, a little ways down below there.

Mrs. Welter, wife of the Coffin Rock light keeper, was out of her house between 10 and 11; there was a pretty thick fog; she did not see the lights of the ferryboat—took no notice of them; didn't look for any lights; the Coffin Rock light is about 200 feet from the house; could not exactly see the light, but could see the shadow of it.

G. C. Fowler, who lives about a thousand feet north of Farr's Dock, on the bluff, which is 250 or 300 feet high, and about a quarter of a mile from where the Cypromene was anchored, testified, as a witness for the libelant, that he heard the collision; was in bed and half asleep at the time. He got up and went out, and saw there were "a lot of lights laying along the ship." It was clear where the witness was; down on the river from where the witness was to the ship it was a little hazy, but from the ship on it seemed to be a solid bank of fog; back of the ship—that is, east of the ship—there was fog; the ship was right on the edge of the fog.

The testimony of Peter Green, a watchman or lookout on the transfer boat, is substantially like that of Larson, the pilot on that boat, except that upon hearing the crash of the collision he looked to see what the matter was, and saw the Hassalo's lights, not very plainly; did not see the lights on the other vessel; it was all of a mile away; the transfer boat was just coming into the ferry slip at Kalama.

For the cross-libelants, James W. Berry, a passenger on the Hassalo, testifies that he was sitting in the forward cabin of the Hassalo at the time of the collision; that he immediately went out on deck; that he saw the ship "plain as day," and could tell exactly what had happened; that the weather was rather hazy, but he could see plainly; that he saw the lights on both sides of the Columbia; that in fact he could see what he thought was the ferryboat at Kalama; that the lights he saw were plain enough.

John Ostervold, a seiner by occupation, was out in his own boat about a quarter of a mile to the northwest of the collision, towards Coffin Rock, at the time the collision occurred. He was on his way down the river, and had passed the Hassalo while the latter was at Kalama. Later, the Hassalo passed the boat of witness as the former turned to go into Goble. He testifies that he saw the lights of the Cypromene soon after he passed Kalama, and that these lights remained in sight until after he had passed the ship; that such lights were visible from a mile to a mile and a half; that the weather was hazy; that he passed the ship about 200 feet on her port side, and thereafter kept the lights of the ship in sight to steer by, to make the Oregon shore, until the collision occurred; that one of

the ship's lights got shaded from him after he had passed "about 45° abaft the beam"; that he kept the light that was not shaded in sight to steer by, and saw the Hassalo coming out of Goble, making down the channel, and saw her constantly until she ran into the ship; that after the collision he ran into a bank of fog so thick that he couldn't see his hand before his face. On cross-examination, in answer to questions as to his noticing the Hassalo when she went into Goble and came out, the witness says:

"We always watch the Hassalo when she is around. I hate to meet her— makes the boat rock so much. I always keep away from her. I was wishing I could get over to the Oregon shore before she overtook me."

Walter Hamm, a passenger, with his wife and children, on board the Hassalo, testifies that he saw the lights at Kalama and Goble immediately after the collision, and there was no fog that he could see.

George Davey, second mate on the Cypromene, says the night was fairly clear; that his watch began at 11 o'clock, and he was on deck continuously until the collision; that he saw the lights on the steamer as she was approaching, three-quarters of a mile away, and he saw the lights at Kalama, Goble, and Coffin Rock; that the lights on the shore were plainly visible, and the ship's lights were burning brightly at the time of the collision; that when he saw the Hassalo approaching he supposed that the captain of the Cypromene was on board, and that the steamer was coming alongside for that reason.

Harry Feringa, an able seaman on the Cypromene, was one of the watch at the time of the accident. About half past 10 there was a little bank of fog that lasted about five minutes, when it cleared away, and it was clear when the collision occurred; while the fog lasted, witness rang the bell; that he first saw the steamer lights about 10 minutes before the accident; that he could see her saloon lights; that he could see the lights on shore at the time.

Arthur E. Olsen, the first mate on the Cypromene, testified that he was called on deck from his berth just before the collision by the second mate, who said there was a boat coming alongside with the captain of the Cypromene, whom they were expecting; that he could see the lights at Kalama, Neer City, and the Oklahoma's lights, and the light at Coffin Rock; that there was no fog.

Messenger, the ship's boatswain, came on deck immediately after the collision. There was no fog, and he saw the shore lights on both sides of the river.

Capt. Roberts, of the Cypromene, testifies that he was on the Hassalo, in his berth asleep, when the collision occurred. He had requested the master of the Hassalo to put him on board his own ship if possible; that the steamer's captain couldn't come to a decision, but said, if he was going to put him on board the ship, Capt. Roberts would be called in time to dress. He testifies that the night was clear, and he saw the Kalama and other lights.

My conclusion is that there was a hazy condition of the atmosphere above and at the place where the Cypromene was anchored at the time of the collision, that did not obscure the lights on the

ship; that these lights could easily have been seen from the Has-salo in time to have avoided collision, and that the collision would have been avoided if there had been a lookout on the Hassalo. The positive testimony of witnesses who saw the lights at Kalama and on both sides of the Columbia from the scene of the accident, and that of Ostervold, who was going down the river in his own boat and kept the ship's light to steer by, is more to be depended upon than the negative testimony of witnesses who didn't see the ship's lights. Moreover, these witnesses are corroborated by two of the witnesses who testified in behalf of the libelant. Peter Green, a lookout on the transfer ferryboat, heard the crash of the collision about the time the transfer boat was landing at Kalama, and looked to see what the matter was. He saw the Hassalo's lights, but not very plainly. He did not see the ship's lights. "It was all of a mile" from where the witness was to the Hassalo. G. C. Fowler, another of libelant's witnesses, hearing the collision from his res-idence, went out and saw a lot of lights lying alongside of the ship. He could see the "bulk of the ship—a dark object," and could see her riding lights, two of them. This witness lives on the bluff, which is 250 or 300 feet high, a distance of about 1,000 feet north of Farr's Dock. He thinks it is about a quarter of a mile from where he was to the place where the ship was anchored. The direction is a little north of east, while that from the Kalama Landing, from which Green saw the Hassalo's lights at the time of the collision, to the same point, is a little west of north. If lights on the ship or on the Hassalo, either or both, were seen from these two points of view, it is impossible that the riding lights of the ship could have been obscured from the course the Hassalo was on. The testi-mony of Ostervold does not admit of mistake. His own boat was ahead of the Hassalo, and he watched the latter boat because he always kept out of her way, and he was hoping to get over to the Oregon shore before she overtook him. The swells caused by this powerful boat going at full speed made it desirable that small craft should keep out of her way. It is a matter of common knowledge among those accustomed to travel on the river that the Hassalo is a source of anxiety to all small craft in her vicinity. The master of the Fannie, who testified for the libelant, says in his testimony that upon hearing the crash of the collision he thought something was breaking on his own boat, until the watchman said everything was all right. He says, "The swells from the Hassalo threw my boat against the dock pretty violently, and I thought possibly some of the piling might have run through her side." Moreover, Oster-vold was steering by the ship's lights. There was a dense fog on the river, but it was below and to the east of the ship, and Oster-vold could not see the Coffin Rock light because of it. The ship's light was his only guide. Of all the witnesses in the case, no one has such good reason for positive knowledge as to whether the ship's lights could be seen or not.

This collision is essentially a duplicate of the collision by which the steamer Oregon, the property of the libelant, sank the ship Clan Mackenzie in December, 1889, at the same place where this colli-

sion occurred, except that in that case the night was clear, although dark. In that case it was found that the inefficiency of the steamer's lookout caused the ship's light to be mistaken for the light at Coffin Rock, and I think it probable, notwithstanding the statements of those navigating the Hassalo, that this is what happened in the present case. If they did not make this mistake, then they were guilty of very great negligence in running the Hassalo at full speed, where vessels are accustomed to anchor, into a fog so thick that it obscured the Coffin Rock light only a short distance ahead. The fact that such light was obscured was notice to them of the existence of the fog which they were approaching. Common prudence required the Hassalo to check her speed and proceed with caution under such circumstances. Taking the statements of her officers as true, the Hassalo, before she reached the bank of fog in question, was running through "a haze" so thick that, according to the master of the Fannie, who was a witness for libelant, her lights could only be seen dimly from Neer City, from 300 to 500 feet distant, as she passed down the river, and she plunged into a bank of fog that obscured the light on Coffin Rock, a little more than a third of a mile ahead, at full speed, without a lookout, past the anchoring ground for ships navigating the river. And, in this connection, the testimony of the master of the Undine, one of libelant's witnesses, is of special significance. This witness, in justification of his own act in running at full speed through the fog, says, "It is impossible to run a steamboat on this river without running full speed; none of them comply with that law." Furthermore, the pilot of the Hassalo knew that this particular ship, the Cypromene, had anchored somewhere down the river, but was expecting to find her at Doublebarr's Landing or at Rainier. He had no right to depend upon a mere expectation of the kind. As a prudent navigator he should have been prepared, notwithstanding his expectation, to find her where he did in fact find her. The libelant cannot say that it did not expect to find the ship where its own tugboat had left her, and where it was the custom of vessels to anchor. Since the accident a lookout has been provided for the steamer; but without this implied admission of negligence in failing to have a lookout at the time of the collision, the duty to have a lookout was imperative. The Supreme Court of the United States, in the case of The Steamship Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943, which sank the Clan Mackenzie at this precise place in 1889, says:

"Considering the darkness of the night, her rate of speed, which was 15 miles an hour past the land, the narrowness of the channel, and the probability of meeting other vessels, the greatest watchfulness was required, and we think that prudence demanded at least an additional lookout. The watch was the smallest that would be tolerated under any circumstances, and, even were it sufficient for navigation by daylight, it by no means follows that it was sufficient for running a river in a dark night. It is hardly possible that in a four-hour watch the attention of the lookout should not be occasionally diverted from his immediate duty. Yet the withdrawal of his eye from the course of the vessel even for the fraction of a minute may occur at a moment when a light comes in sight, and, before this light can be accurately located and provided for, a collision may take place. As was said by Mr. Justice Swayne in The Ariadne, 13 Wall. 475, 478 [20 L. Ed. 542]: 'The duty

of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of the vessel, with all the property, and the lives of all on board. The same consequences may result to the vessel with which his shall collide. In the performance of his duty the law requires indefatigable care and sleepless vigilance.'"

If there had been a lookout on the Hassalo, or if that boat had been run at a moderate rate of speed, the collision would in all probability have been avoided.

The libel of the Oregon Railroad & Navigation Company will be dismissed. The question of the damages to which the ship is entitled is reserved, in pursuance of the stipulation between the parties in the case.