BOSTON, CAPE COD & NEW YORK CANAL CO. v. T. A. SCOTT CO., Inc. SAME v. WHITE OAK TRANSP. CO. WHITE OAK TRANSP. CO. et al. v. BOSTON, CAPE COD & NEW YORK CANAL CO. et al.*

(Circuit Court of Appeals, First Circuit. May 18, 1920.)

Nos. 1397-1399.

1. Canals ⬥23, 29—Canal company and vessel both at fault for stranding of vessel in canal.

On a libel for the stranding in a canal of a heavily laden whaleback steamer, which steered with difficulty, the steamer *held* at fault for attempting to enter the canal, which she was not fitted to navigate, and the canal company *held* also at fault for granting permission to enter the canal, so that neither can recover damages from the other for the first stranding of the vessel.

2. Canals ⬥23—Vessel held at fault for stranding after attempt to navigate in crippled condition.

A heavily laden whaleback steamer, which had stranded in a canal and shipped water, so that when she slipped from the bank she was down at the head and listed to port, *held* at fault for attempting to navigate the canal in that condition, and liable for damages to the canal, caused by her subsequent stranding and sinking.

3. Canals ⬥23—Master, not canal pilot, must determine ability to navigate canal.

The master of a vessel in a canal in charge of a canal pilot is charged with the duty of determining whether the vessel is in condition to navigate the canal after having been stranded, so that the vessel is liable for damage to the canal resulting from navigation in a crippled condition.

4. Canals ⬥23—Canal company held not to have consented to navigation by crippled vessel.

Even though a canal pilot was in the employ of a canal company when he attempted to pilot a crippled vessel after she had stranded in the canal, or had general charge of the canal tugboats, one of which was towing the vessel, the canal company cannot be held to have assented to navigation by the vessel in that condition, in the absence of evidence that the pilot was intrusted with the duty of determining what vessels should navigate the canal.

5. Salvage ⬥22—Wrecking company relieved from liability by turning vessel over to pilot.

A wrecking company, which was in charge of the work of pulling off a stranded vessel, was relieved from liability for damages resulting from

the navigation of the vessel after she was pulled off, where the company's captain expressly turned the vessel over to the pilot, who was navigating her.

**6. Canals ☞23—Allegation held to cover navigating canal in crippled condition.**

An allegation in a libel that defendant was negligent in attempting to navigate the canal with a steamer difficult to steer and control, and apt to become unmanageable, is sufficient to cover negligence in navigating the vessel after she had become more unmanageable than before because of injuries received from stranding.

Appeals from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Separate libels by the Boston, Cape Cod & New York Canal Company against the T. A. Scott Company, Incorporated, by the Boston, Cape Cod & New York Canal Company against the White Oak Transportation Company, and by the White Oak Transportation Company against the Boston, Cape Cod & New York Canal Company. Decree for libelees in each libel, and libelants appeal. Decree in first and third libels affirmed, and decree in second libel reversed and cause remanded.

For opinion below, see 251 Fed. 356.

Samuel H. Pillsbury, of Boston, Mass. (Thomas H. Mahony and Currier, Young & Pillsbury, all of Boston, Mass., on the brief), for Boston Cape Cod & New York Canal Co.

Samuel Park, of New York City (Park & Mattison, of New York City, on the brief), for T. A. Scott Co.

Henry E. Warner, of Boston, Mass. (Warner, Stackpole & Bradlee, of Boston, Mass., on the brief), for Northern Coal Co.

Edward E. Blodgett, of Boston, Mass. (Foye M. Murphy and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., on the brief), for White Oak Transp. Co.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. These three cases arose out of the stranding in the Cape Cod Canal of the Bay Port, a lake-built steamer of the whaleback type, 265 feet long and of 38 feet beam, which was brought to the Atlantic coast about 1905, and after some alterations was used for carrying coal between Atlantic ports.

Soon after noon on December 13, 1916, she appeared at the westerly or Wing's Neck entrance of the Cape Cod Canal, loaded with 2,393 tons of coal, and having a draft of 18 feet 2 inches aft and 17 feet 8 inches forward. Her captain was Hiram W. Hammett, who had been a master mariner 27 years and for 4 years had held a master's license for steam vessels. He had been through the canal twice with the Bay Port when unloaded, but never when loaded. Upon one of those trips he had been given by the Canal Company a book containing information in regard to the navigation of the canal and its general features, including the statement that it had a depth of 25 feet at mean low water.

Having obtained the necessary permission to go through the canal, she began its passage in tow of a tug and with a competent pilot.

The court below has found that neither the pilot nor the tug were so far the agents or servants of the Canal Company as to make it answerable for their negligence; that while, previous to September 1, 1916, under the authority given by its charter, it had furnished pilots and tugboats to vessels for the navigation of the canal, it then discontinued this practice, and had given notice to vessel owners using the canal, including the owners of the Bay Port, that it had done so. We are satisfied with this finding.

The tide was about half ebb and running west with a velocity of about 3 knots when the Bay Port started to go through the canal. She had proceeded about half its length, when she took a short sheer toward its north bank, which the tugboat succeeded in checking. After continuing a short distance parallel with the north bank, and on the north side of the channel, she sheered again toward the south bank, upon which she grounded. Assistance was summoned by her whistle, and two other tugs, which were used for towing through the canal, came to her aid, and with them Superintendent Geer of the Canal Company. All attempts of the tugs to pull her off the bank were unsuccessful and were given up, as the tide was falling.

The T. A. Scott Company, Incorporated, engaged in salvage operations, with an office in Boston, was notified by the agents of the owners of the steamer, and it sent to the canal Capt. Joseph Lewis, an experienced wrecking master.

One of the regulations issued by the Canal Company provided that—

"In the event of grounding, the canal authorities shall have the right to direct all operations for floating the vessel."

When Capt. Joseph Lewis arrived, Superintendent Geer turned over to him the work of getting the Bay Port afloat, and ordered the tugboat captains to render him such assistance as they could. The Bay Port was kept upon the bank that night by two of the tugs, under steam, pressing her against the bank, and her pumps were kept working. The next morning a diver sent down by the Scott Company discovered a hole in her, which was plugged up, and the pumping of water from her hold by her own pumps was continued. Arrangements had also been made by the Scott Company to lighten her cargo, when, unexpectedly, about 10:15 a. m., she slid off the bank into the channel of the canal. The tide was then running east at about 3 knots an hour. The pilot who upon the day before had undertaken to pilot her through the canal was not present, but another canal pilot, Capt. William T. Lewis, was upon one of the tugboats, and when the Bay Port slid off the bank he jumped from the tug aboard the steamer and ran upon her bridge with her captain, of whom he inquired if he had steam up, and, being told that he had, he directed him to start his engines full speed ahead to prevent her drifting upon the opposite bank.

When she came off the bank into deeper water, she was down at the head about 18 inches, according to Capt. Hammett, and about 30 inches, according to Pilot Lewis, and had a list to port of about 15

inches, according to the former, and about 24 inches according to the latter. The tide had then been flowing easterly in the canal since 6 a. m., and the Bay Port was caught by it and commenced to drift to the eastward. The three tugs, with steam up, were all hanging to the port side of the Bay Port, but were headed toward the west; and upon the same side, about amidships, was a small wrecking boat of the Scott Company. Pilot Lewis gave a command to one of the tugs to take the wrecking boat in charge, and to another to get a hawser upon the Bay Port's bow, which it did after it had turned about, and commenced to tow the Bay Port eastward. She had proceeded only about a mile when the Bay Port sheered toward the north bank, and, the tug being unable to break the sheer, her bow grounded heavily, her stern was swung by the current across the canal and grounded upon the south bank, causing her bow to slide off the north bank, and she rapidly filled and sank.

The allegations of negligence in the libel of the Canal Company against the Scott Company are in substance that the Scott Company did not take adequate means for holding the Bay Port to the bank after her first stranding, and that, by such failure, they permitted her to come afloat in the canal in an unsafe condition for navigation and negligently failed to be prepared to complete her passage through the canal.

The allegations of negligence in its libel against the owners of the Bay Port are that the Bay Port was allowed to enter the canal when she was difficult to steer and control and apt to become unmanageable; that they also neglected properly to care for the Bay Port while she was resting on the bank subsequent to the stranding of December 13th, and negligently suffered her to slide off the bank when she was not prepared to complete the navigation of the canal; and that they attempted to navigate the canal with a steamer which was very difficult to steer and control, and apt to become unmanageable and fail to answer her helm.

The allegations of negligence in the libel of the owners of the Bay Port against the Canal Company are that the Canal Company had misrepresented the depth of water in the canal, having represented in its book issued to the public in regard to the canal that it had a depth of 25 feet at mean low water, while in the vicinity of both strandings of the vessel there were shoals over which there was only a depth at mean low water of between 18 and 19 feet, and also that the canal had been so constructed that, near the place of the first stranding, there was a projection from its north bank toward its channel, which had been left when the canal was constructed, and caused a current to set toward its south side when the tide was flowing from the eastward.

The learned judge of the District Court has found that, while there was a less depth of water than 25 feet near the places in the canal where the two strandings occurred, there were from 21 to 22 feet of water on the shoal over which the Bay Port passed before the first stranding and 23 feet or more on the shoal passed over by her before the second, and that, as her greatest draft was a little

over 18 feet, the contention of her owners that she "smelled the bottom" and was caused to sheer by the shoal water was not sustained, and that, assuming that these shoals caused her to sheer, they were so far distant from the places where the vessel stranded they were not the proximate cause of her stranding in either case, as she had passed the shoal before the first stranding by about 1,000 feet, and by about 2,000 feet before the second, and for the whole of each of these distances there was a depth of more than 25 feet of water in the channel. He has also found that the projection on the north bank of the canal did not reach into the channel of the canal and did not constitute any menace to navigation, that vessels constantly passed it in safety, and that the condition of the canal here did not warrant a finding of negligence against the Canal Company.

We think these findings are sustained by the evidence. The grounds on which they are based are so fully stated in the careful opinion of the learned District Judge that it is unnecessary to add anything to the reasons which he has given.

[1] The District Court has also found that the Bay Port, when she applied for admission to the canal, was—

"a staunch vessel, properly manned, supplied, and equipped. * * * She steered as well as the ordinary whaleback steamer; but vessels of that type do not handle as sharply, nor as well, as those of the usual deep sea model. She was deeply laden, but not so as to interfere with her ability to maneuver."

We think this finding in regard to her steering qualities, qualified as it was, that "she steered as well as the ordinary whaleback steamer," is in accord with the evidence; but this convinces us that any steamer of this type, when deeply laden, is very difficult to handle, much more so than those of "the usual deep sea model," and that, even when properly trimmed and in tow of a tug, she is liable to sheer. While we think the Bay Port was negligent in attempting to go through the canal, yet we also think the Canal Company was equally negligent in allowing her to enter it, and that the hazard of her attempted passage was assumed by the Canal Company with full knowledge of the risk. Mr. Geer, its superintendent, testified that he had remonstrated with the officers of the canal against the admission of vessels of her type, but that he had been overruled by them.

When the narrowness of the channel of the canal is taken into consideration, it being only 100 feet wide, with sloping banks of 2 feet horizontal to 1 vertical, which were loaded with riprap in order to prevent their erosion, the danger in undertaking to tow through it such a craft as the Bay Port, laden to a depth of 18 feet, against a current of 3 to 3½ knots, is apparent, as in her deeply laden condition. her hull would be largely below the surface of the water and she would sheer easily and be difficult to steer. Her peculiar structure and draft must have been as well known to the superintendent of the canal as to the captain of the vessel, for he testified that he saw her as she entered the canal, and the pilot who went out to her asked her captain her draft, and was informed what she drew both forward and aft, and must have reported to the superintendent what he was told, as the superintendent was to pass upon her admission to the canal, and

she could not enter the canal without his permission. It is in evidence, also, that on February 13, 1917, only 2 months after the stranding of the Bay Port, the Canal Company was convinced that Superintendent Geer was right in his judgment that vessels of the Bay Port's type should not be allowed to enter the canal, for it issued a circular in which it provided that—

"No vessel of the whaleback or Great Lakes type will be permitted to pass through the canal."

There was no evidence that any change had been made in the canal or in vessels of the whaleback type, and this action by the Canal Company recognized a danger in their use of the canal, which it either knew or should have known when, as Superintendent Geer testified, it solicited the use of the canal by vessels of the whaleback type.

[2] While we think the Bay Port was negligent in attempting to use the canal in her deeply laden condition, we think the Canal Company was equally at fault in allowing her to use it, and that neither should recover for any damage which may have been suffered by reason of her attempt to go through in the condition in which she was when she entered it; no negligence being alleged in her navigation by the pilot or the tugboat or members of her own crew. When she came afloat, however, on the morning of December 14th, her unmanageability had been largely increased. It is self-evident that a vessel down at the head 18 inches, with a list of 15 inches, as testified to by her captain, and with water in her hold above her cargo, would be a more unwieldly vessel to navigate than she was on the preceding day, and that in this narrow waterway, with its necessary bends and a tidal current of 3 or 4 knots an hour, she would be likely, in view of what had happened, to sheer badly and come into collision with the canal bank on one side or the other. While there was evidence that Superintendent Geer gave instructions on the night of December 13th to get her through the canal as quickly as possible, this instruction did not authorize an attempt to get her through in the condition in which she was after she floated.

We do not think any sudden emergency arose when she slid off the bank, which was of such a character as to excuse her master from exercising the judgment which the law exacts from a master who has in his charge a valuable ship and cargo, and which would authorize him to surrender the command of his ship in her condition to a pilot upon whose skill in navigation only he was to depend. He was not confronted with imminent danger, although his vessel was caught by the current and began to drift with it. There were three tugs at her side with steam up, and all of the witnesses, including Capt. Hammett, testified that it would have been possible for these tugs to hold her in the channel of the canal in deep water, or to place her at the dolphins, which were only about 1,000 feet to the eastward, until she could be pumped out and her cargo adjusted, so that she might be in better condition to undertake the passage of the remainder of the canal. His reason for turning over the command of his vessel to the pilot, William Lewis, is given in the following testimony in reply to questions by the court:

"The Court: I mean Capt. William Lewis. I mean, how did Pilot Lewis happen to go aboard?

"The Witness: Oh, Pilot Lewis? That I couldn't tell you, sir; I have no idea. All I know is, he was there; he came there in the morning, early morning.

"The Court: Why were you turning over the command of your vessel to him, if you don't know why he was there?

"The Witness: Well, I presume he was there to pilot the ship, of course; what I mean is, he was there to pilot the ship of course.

"The Court: No; it is not 'of course' at all. You have got to show me why he was there to pilot the ship. That is just what I want to know.

"The Witness: Well, Capt. Rochester was the first pilot.

"The Court: Yes.

"The Witness: And he was sent on some other job; and I presumed that they sent Pilot Lewis in his place.

"The Court: I don't care what you presumed. I want to know what happened. The fact was that Pilot William Lewis showed up aboard of your vessel?

"The Witness: Yes, sir.

"The Court: Thereupon you turn the command of the vessel over to him when she goes afloat?

"The Witness: Yes, sir; as he is pilot of the canal, sir, and I was not; I was not pilot, and he was a pilot."

[3] We think that Capt. Hammett was justified in assuming that Lewis was to complete the pilotage of the Bay Port through the canal, as Rochester, the pilot of the previous day, was not present; but Lewis' duties related only to pilotage through the canal. The question of determining whether the vessel was in proper condition for navigation was not for his decision, however, but for that of Capt. Hammett alone, and even with the pilot in command of the navigation of the vessel, it has been held that the captain is not to leave the whole responsibility to him. In The Oregon, 158 U. S. 186, at page 194, 15 Sup. Ct. 804, at page 808 (39 L. Ed. 943), the court said:

"Nor are we satisfied with the conduct of the master in leaving the pilot in sole charge of the vessel. While the pilot doubtless supersedes the master for the time being in the command and navigation of the ship, and his orders must be obeyed in all matters connected with her navigation, the master is not wholly absolved from his duties while the pilot is on board, and may advise with him, and even displace him in case he is intoxicated or manifestly incompetent. He is still in command of the vessel, except so far as her navigation is concerned, and bound to see that there is a sufficient watch on deck, and that the men are attentive to their duties."

The master, because of the skill and experience by which he holds his position, and also by reason of his knowledge of the steering qualities of his vessel, is in a great deal better position to judge whether she is prepared to undergo the hazards of navigation under the circumstances which, in its general features, are known to him. While the pilot had more intimate knowledge of the navigation of the canal and of its currents and depth of water at different places, yet Capt. Hammett knew the general characteristics of the canal, and the height and velocity of the tide. He heard, as did several other witnesses, Capt. Joseph Lewis, of the Scott Company, shout to Pilot Lewis, who was upon the bridge of the Bay Port, "She is up to you." He was upon the bridge of his vessel at that time with the pilot, and must be held to have assented to the turning over of the vessel by the Scott

Company, and we think, as did the judge below, that it was relieved of further responsibility, and that the Bay Port went forward on her own account.

[4] While, when she entered the canal upon the previous day, we think the Canal Company assented to her navigation of the canal in the condition in which she then was, we do not find any evidence that the Canal Company assented to her undertaking the navigation of the canal in the condition in which she was when she slid off the bank; for if it be admitted, without deciding, that Pilot Lewis was in the employ of the Canal Company as a pilot at this time, or that he had general charge in the absence of Capt. Geer, as the latter testified, of the tugboats in the canal, there is no evidence that he was intrusted with the duty of determining what vessels should navigate the canal, nor the condition in which a vessel should be before undertaking its navigation, nor of performing any of the duties of a superintendent of the canal.

We think it cannot be said, therefore, that the Canal Company assented that the Bay Port might attempt the navigation of the canal under the conditions in which she then was. Capt. Hammett gave as his reason for going forward with the Bay Port in her condition that there had been a general understanding between Capt. Joseph Lewis, William Lewis, and himself the night before that the Bay Port should be taken through the canal as soon as she came off the bank and tied up at Sandwich, at the east end of the canal, where there was a sandy bottom, upon which she could rest until the necessary repairs were made upon her.

Upon cross-examination he was asked:

"X-Q. You do not recall who made the suggestion that she should be tied up at Sandwich? A. No; I do not particularly.

"X-Q. Did that seem to you to be the proper thing to do? A. I think so; yes, sir.

"X-Q. In the event of her floating, she was to be tied up at Sandwich? A. I think so; yes, sir; that was the general impression."

When the Bay Port came afloat, Capt. Hammett testified that he followed Pilot Lewis onto her bridge; that they both arrived there about the same time, and he thus describes what occurred:

"X-Q. What was the first thing you did after you got on the bridge? A. I didn't do anything.

"X-Q. You just stood there? A. Just stood there; yes, sir.

"X-Q. What was the first thing you observed him doing? A. The first—he didn't do anything, except to tell me to ring up full speed ahead.

"X-Q. He told you to ring full speed ahead? A. Yes, sir.

"X-Q. Where was the boat at that time? A. She might have been once her length from where she struck, possibly.

"X-Q. How far out from the shore? A. She had drifted out a little, just clear.

"X-Q. Did you do what he said? A. Exactly; yes, sir.

"X-Q. Did you think that was the right thing to do? A. I think so, sir.

"X-Q. Do you still think so? A. Yes, sir."

He further testified in regard to what was said by Joseph Lewis, of the Scott Company, to Pilot William Lewis, as follows:

265 F.—35

"X-Q. Do you recall any orders given by Joseph Lewis? A. I don't think there was only one order that I heard; that was: 'The ship is up to you, Capt. Lewis.'

"X-Q. You heard him say to Capt. Lewis: 'The ship is up to you, Capt. Lewis'? A. Yes; 'The ship is up to you, Capt. Lewis.'

"X-Q. What reply did you hear Capt. Lewis make? A. I didn't hear any reply at all; I don't know as he replied to him.

"The Court: You mean Pilot Lewis?

"The Witness: Yes, sir; Pilot Lewis."

While Capt. Hammett testified that his vessel, although logier than she was the day before, handled all right for about a half mile after she came off, Pilot Lewis described her as steering badly from the very first; that she steered a zigzag course and was difficult to control from the time she started until she struck the bank.

The captain of the tugboat Dalzelline, which had her in tow, testified—

"that she went from one side to the other of the canal after she came off; that she would dive from one side to the other, and that this was true all the way until she struck."

The mate of the tugboat also testified that the Bay Port sheered "practically as soon as she got afloat." It is evident that a vessel of her type, in the condition in which she was, would steer badly; and this fact must have been known to Capt. Hammett. Looking at the situation as it is presented by the evidence, and not in the light of subsequent events, we think that he was negligent in allowing his vessel to proceed before she was pumped out and her cargo adjusted. The tide was rising, and in about two hours would have been high, when there would have been slack water in the canal and its navigation made safer for a vessel of the Bay Port's type.

[5] We are satisfied with the finding of the court that the Scott Company was relieved from all further responsibility when the vessel floated, with her captain and crew aboard and a pilot upon her deck, who, in the presence of the captain, assumed control of the ship.

[6] We think the following allegation of negligence in the libel of the Canal Company against the White Oak Transportation Company is sufficiently broad to cover the attempt to navigate the Bay Port while in the canal, and that it applies to her in the condition in which she was after she slid off the bank, and is not confined to her condition when she entered the canal:

"(b) In that the defendant attempted to navigate the canal with a steamer which was very difficult to steer and control and apt to become unmanageable and fail to answer her helm, which fact was known to the defendant, its officers and agents, or which reasonably should have been known to it and them."

The Canal Company does not, in its answer to the libel of the owners, allege that there was any negligence on the part of the pilots or the tugs which had the steamer in tow at the time of either stranding; but we think, as we have said, that the allegation in its libel is sufficiently broad to cover the attempt to navigate the Bay Port in her disabled condition. While it is impossible to determine that she would not have stranded, even if she had been in the same condition as on the

previous day, yet we think the danger of her doing so was largely increased by her condition after she floated, and was one of the causes that directly contributed to her second stranding, and that, as the Canal Company had not consented to her navigation of the canal in this condition, it is entitled to recover all damage which it has suffered from her second stranding and sinking.

In No. 1397, the decree of the District Court is affirmed, and the appellee recovers its costs of appeal.

In No. 1398, the decree of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, and the appellant recovers its costs of appeal.

In No. 1399, the decree of the District Court is affirmed, and the appellees recover their costs of appeal.